ELLEN F. ROSENBLUM
Attorney General
SHEILA H. POTTER  #993485
Deputy Chief Trial Counsel
ANNA M. JOYCE #013112
Solicitor General
MARY WILLIAMS #911241
Special Assistant Attorney General
Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Sheila.Potter@doj.state.or.us
          anna.joyce@doj.state.or.us
          mary_h_williams@msn.com

Attorneys for State Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DEANNA L. GEIGER** and **JANINE M. NELSON; ROBERT DUEHMIG** and **WILLIAM GRIESAR**,<br><br>            Plaintiffs,<br><br>       v.<br><br>**JOHN KITZHABER,** in his official capacity as Governor of Oregon; **ELLEN ROSENBLUM**, in her official capacity as Attorney General of Oregon; **JENNIFER WOODWARD**, in her official capacity as State Registrar, Center for Health Statistics, Oregon Health Authority; and **RANDY WALDRUFF**, in his official capacity as Multnomah County Assessor,<br><br>            Defendants. | Case No.  6:13-cv-01834-MC<br>(Lead Case)<br><br>DECLARATION OF SHEILA H. POTTER |

Page 1 -   DECLARATION OF SHEILA H. POTTER
           SP3/cjw/5102344-v1

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

|  |  |
|---|---|
| **PAUL RUMMELL** and **BENJAMIN WEST; LISA CHICKADONZ** and **CHRISTINE TANNER; BASIC RIGHTS EDUCATION FUND**,<br><br>    Plaintiffs,<br><br>    v.<br><br>**JOHN KITZHABER**, in his official capacity as Governor of Oregon; **ELLEN ROSENBLUM**, in her official capacity as Attorney General of Oregon; **JENNIFER WOODWARD**, in her official capacity as State Registrar, Center for Health Statistics, Oregon Health Authority; and **RANDY WALDRUFF**, in his official capacity as Multnomah County Assessor,<br><br>    Defendants. | Case No.  6:13-cv-02256-TC |

I, Sheila H. Potter, declare:

1.    I am one of the attorneys for state defendants John Kitzhaber, Ellen Rosenblum, and Jennifer Woodward. I make the following statements of my own knowledge.

2.    On October 16, 2013, Oregon's Chief Operating Officer and Department of Administrative Services (DAS) Director Michael Jordan sent an e-mail to all Agency Directors, citing and attaching a Letter from Mary Williams, Deputy Attorney General. The e-mail directed Oregon state agencies to recognize out-of-state same-sex marriages that were valid and legal in the states in which they had been performed. (An accurate copy of the e-mail and its attachment are attached as Exhibit 1 to this Declaration; *see* Ex. 1.)

3.    An accurate copy of the Williams Institute's *Census Snapshot for Oregon* (Adam P. Romero, Clifford J. Rosky, M.V. Lee Badgett & Gary J. Gates, Census Snapshot for Oregon, The Williams Inst. (February 2008)) is attached as Exhibit 2 to this Declaration. It may also be found at http://williamsinstitute.law.ucla.edu/wp-content/uploads/OregonCensus2000Snapshot.pdf.

Page 2 -    DECLARATION OF SHEILA H. POTTER
         SP3/cjw/5102344-v1

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

4. The Oregon Department of Human Services does not take sexual orientation into account when making foster or adoption placements. Those policies are stated on its website. *See* DHS, Foster Parenting—Frequently Asked Questions (last accessed March 5, 2014), http://www.oregon.gov/dhs/children/fosteradopt/pages/foster/faq.aspx; DHS, Adoption Frequently Asked Questions (last accessed March 5, 2014), http://www.oregon.gov/dhs/children/fosteradopt/pages/adopt/faq.aspx.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on March  18 , 2014.

           s/ Sheila H. Potter
SHEILA H. POTTER
Deputy Chief Trial Counsel

Page 3 -    DECLARATION OF SHEILA H. POTTER
SP3/cjw/5102344-v1

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

| | |
|---|---|
| **Subject:** | FW: Recognizing Out-of-State, Same-Sex Marriages | A.G. Opinion |
| **Attachments:** | AG_Opinion.pdf |

**From:** JORDAN Michael J * COO [mailto:michael.j.jordan@state.or.us]
**Sent:** Wednesday, October 16, 2013 12:58 PM
**To:** Agency Heads - Brds_Commissions; AGENCY HEADS
**Cc:** Agency_Heads_Asst_Dist
**Subject:** Recognizing Out-of-State, Same-Sex Marriages | A.G. Opinion

**To:**    Agency Directors

**From:**    Michael Jordan
    Chief Operating Office and DAS Director
    Department of Administrative Services

**Re:**    Recognizing Out-of-State, Same-Sex Marriages and A.G. Opinion

In light of recent United States Supreme Court decisions on same-sex marriage, the Department of Justice reviewed the potential impact of those decisions on Oregon state agencies. The DOJ opinion is attached, but in short, Oregon agencies must recognize all out-of-state marriages for the purposes of administering state programs. That includes legal, same sex marriages performed in other states and countries.

The DOJ opinion discusses the difference between Oregon's definition of marriage – as between one man and one woman – and the state's practice of recognizing marriages performed in other states. It describes how Oregon courts have consistently recognized valid out-of-state marriages, even when the marriage could not be performed in Oregon – such as common-law marriages. Although the Oregon constitution might be construed to prohibit recognizing out-of-state same-sex marriages, DOJ concludes that such a construction would violate the federal constitution.

This DOJ opinion does not answer the question regarding a same sex couple's ability to legally wed in Oregon. However, it makes a clear case for all legal marriages performed in other states and countries to be recognized in Oregon. Please keep this in mind as you administer the many programs Oregonians count on each day.

ELLEN F. ROSENBLUM
ATTORNEY GENERAL



MARY H. WILLIAMS
DEPUTY ATTORNEY GENERAL

## DEPARTMENT OF JUSTICE

Justice Building
1162 Court Street NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4400

October 16, 2013

**THIS IS AN ATTORNEY-CLIENT PRIVILEGED COMMUNICATION. NEITHER THIS DOCUMENT NOR ITS CONTENTS SHOULD BE CIRCULATED BEYOND THE IMMEDIATE ADDRESSEES OR DISCUSSED AT A PUBLIC MEETING WITHOUT FIRST CONSULTING WITH COUNSEL.**

Michael Jordan
Chief Operating Officer
Department of Administrative Services
155 Cottage St. NE, U20
Salem, OR 97301-3966

Dear Michael:

In the last year alone, a significant and growing number of countries and states, including our neighboring states of California and Washington, have begun to recognize same-sex marriages. The federal government also now recognizes same-sex marriages for the purpose of administering federal laws, as a result of a United States Supreme Court decision issued in June of this year. In light of these

developments, you asked whether Oregon agencies can recognize same-sex marriages from other jurisdictions for purposes of administering Oregon law. For example, can state agencies treat a same-sex couple married in Washington and not registered as domestic partners in Oregon as married for purposes of administering tax laws and benefits programs such as providing health insurance. We conclude that state agencies can recognize these marriages as valid. To do otherwise would likely violate the federal constitution.

## DISCUSSION

### I.  Recent developments in federal law concerning recognition of same-sex marriage

Since its passage in 1996, section (3) of the federal Defense of Marriage Act (DOMA) denied federal recognition of any same-sex marriages.[1] In June, the United States Supreme Court held that provision unconstitutional because it violated equal protection and due process guarantees of the federal constitution. *United States v. Windsor*, 570 US ___, 133 S Ct 2675 (2013). As a result of that decision, same-sex married couples living in jurisdictions that recognize same-sex marriage will now be considered to be married for purposes of federal law.[2]

Following these decisions, federal agencies and the United States Department of Justice have begun addressing the implications for federal programs. While some federal law considers the validity of marriage based on the place of habitation and some law considers the validity based on the place the

---

[1] Section 3 of DOMA provided:

"In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."

[2] The Court was not asked to address the constitutionality of section (2) of DOMA, which permits states to refuse to recognize same-sex marriages performed out-of-state.

Page | 2

marriage was performed, the agencies' advice has largely done away with that distinction. At least some federal benefits—including military benefits and benefits under the tax laws—are now to be provided to same-sex couples who enter into a valid marriage anywhere, notwithstanding any prohibitions on that marriage in their place of residency.[3]

For purposes of administering Oregon programs that provide different benefits or obligations based on marital status, Oregon must look to its own laws, as neither *Windsor* nor the federal guidance controls.

## II. Oregon law governing same-sex relationships

The Oregon Family Fairness Act allows same-sex couples to enter into domestic partnerships. ORS 106.300. Under the Act, all privileges, immunities, rights, and benefits conferred by law on the basis of marital status is granted on equal terms to registered domestic partners. ORS 106.340.

While same-sex couples can enter into domestic partnerships and thereby obtain many of the same benefits of married individuals, they are not permitted to marry in Oregon. Article XV, section 5a of the Oregon Constitution provides that

> It is the policy of Oregon, and its political subdivisions, that only a marriage between one man and one woman shall be valid or legally recognized as a marriage.

Article XV, section 5a clearly prohibits marriages of same-sex couples from being performed in Oregon.

Recognition of otherwise valid out-of-state marriages is a separate question. But as a general principle of Oregon law, "a marriage which is recognized as valid in the state where it was performed will be recognized in Oregon." *Garrett v. Chapman*, 252 Or 361, 364, 449 P2d 856 (1969). There is a potential limit to that rule "where the policy of this state dictates a different result than would be reached

---

[3] *See, e.g.*, Revenue Ruling 2013-17. The federal advice has not been entirely consistent. For example, the Social Security Administration appears to look to the law of the couples' state of residency in determining whether they are married. We will continue to monitor the federal guidance and encourage state agencies to contact us if they have questions in this area.

Page | 3

by the state where the marriage was performed." *Id.* The issue is, therefore, whether any "policy of this state" dictates that Oregon cannot recognize a marriage validly solemnized in the state where it was performed. If it exists, that policy would be found in the same section of the Oregon Constitution, in its declaration that only marriages "between one man and one woman shall be * * * legally recognized as a marriage."

### III. Oregon's constitutional prohibition on same-sex marriage would likely be construed as also prohibiting recognition of out-of-state same-sex marriages. But such a construction would likely violate the federal constitution.

In construing a constitutional provision enacted through the initiative process, courts look to discern the intent of the voters and begin first with the text and context of the provision. *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559 (1994). Context includes other constitutional provisions as well as caselaw and other relevant statutory framework in effect at the time of the initiative. *Shineovich and Kemp*, 229 Or App 670, 683 (2009). If the intent is not clear from the text and context, courts turn to the history of the provision. *Ecumenical Ministries*, 318 Or at 559. If the intent is still ambiguous, courts turn to general maxims of construction. *Shineovich*, 229 Or at 683.

Article XV, section 5a specifically states that only a marriage between an opposite-sex couple is valid and legally recognized as a marriage. The provision is silent as to marriages validly entered into in other states. But the broad language prohibiting legal recognition of same-sex marriage would—based purely on the plain text—appear to bar the recognition of otherwise valid same-sex marriages for purposes of state law.

Context and history confirms what the text suggests. For an initiative measure, the history includes what the voters were told about the measure during the election. In the Voters' Pamphlet for the November 2004 General Election, the Measure's Summary explained that "[c]urrently the State of Oregon recognizes out-of-state marriages that are valid in the state where performed, unless the marriage violates a strong public policy of Oregon. Measure [36] adds to Oregon Constitution a declaration that the policy of the State of Oregon and its political subdivisions is that 'only a marriage between one man and one woman shall be valid or legally recognized as a marriage.'" Official 2004 General Election Voters' Pamphlet, v 1, November 2, 2004 at 77.

Page | 4

A court then would almost certainly conclude that the Oregon constitutional provision bans recognition of an otherwise valid same-sex marriage performed under the laws of another jurisdiction. But Oregon law—even those laws enshrined in our constitution—still must pass muster under the federal constitution. Although it is a long-recognized tenet of federal law that marriage and domestic relations are matters generally left to the states, *Ex parte Burrus,* 136 US 586, 593-94 (1890), state-imposed restrictions on marriage must comply with the federal constitution. *See, e.g., Loving v. Virginia,* 388 US 1, 12 (1967) (holding that a state statute limiting marriage to same-race couples violated equal protection and due process); *Zablocki v. Redhail,* 434 US 374, 383 (1978) (holding that a state statute restricting marriage by persons owing child support violated equal protection). If an Oregon court construed our constitution so as to prohibit recognition of out-of-state same-sex marriages, we believe the court would find that provision violates the federal constitution's equal protection principles.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states from denying "to any person within its jurisdiction the equal protection of the laws." US Const Amend XIV, § 1. Equal protection is "a pledge of the protection of equal laws." *Yick Wo v. Hopkins,* 118 US 356, 369 (1886). Equal protection coexists with the reality that legislation must classify. *Romero v. Evans,* 517 US 620, 631 (1996). When a law classifies in a manner that neither targets a suspect class nor burdens a fundamental right, the court will uphold the law so long as it is rationally related to some legitimate government interest. *Heller v. Doe,* 509 US 312, 319-20. The classification itself must relate to the purported interest. *Plyler v. Doe,* 457 US 202, 220 (1982). Most laws subject to rational basis review easily survive, because a legitimate reason can nearly always be found for treating different groups in an unequal manner. *Romer,* 517 US at 633. And courts defer to legislative judgment if there is at least a debatable question whether the underlying basis for the classification is rational. *Id.* at 632.

But even under this most deferential standard of review, the court must "insist on knowing the relation between the classification adopted and the object to be attained." *Id.* And the classification must "find some footing in the realities of the subject addressed by the legislation." *Id.* The search for a rational relationship, while deferential, "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633. To survive rational basis review, a law must do more than disadvantage or harm a particular group. *United States Dept of Agriculture v. Moreno,* 413 US 528, 534 (1973).

Applying that analysis here, we begin with the classification. As it relates to the question addressed in this opinion, Article XV, section 5a creates a classification of same-sex couples legally married in other states. It singles out those couples' valid marriages and denies them recognition in Oregon. Proponents and opponents alike understand that the law targets gays and lesbians in a manner specific to their sexual orientation by denying recognition of only their valid marriages. That is the law's express purpose.

The question then becomes whether we could articulate a justification for targeting same-sex couples in that manner. We cannot identify *any* defensible state interest, much less a legitimate or compelling one, in refusing to recognize marriages performed between consenting, unrelated adults under the laws of another state—marriages that would be unquestionably accorded recognition if the spouses were of opposite sexes. Likewise, we cannot identify any legitimate (much less compelling) state interest in requiring that each marriage recognized in Oregon contain one partner of each sex; no benefit to Oregon results from that limitation, and no injury would result from recognizing the marriages.

And same-sex relationships are given legal recognition in Oregon, in the form of domestic-partnership registration. To defend a refusal to acknowledge marriages, the state would have to articulate a state interest in allowing partnerships but refusing to recognize marriages—and, again, we cannot point to any such interest that would pass constitutional muster at even the lowest possible level of scrutiny, rational basis review.

What is more, a court is very unlikely to apply rational basis review. Article XV, section 5a, mandates differential treatment of a group that has been subjected to "a history of purposeful unequal treatment." And the U.S. Supreme Court has referred to the freedom to marry as a fundamental right, protected by the Due Process Clause of the Fourteenth Amendment. *See, e.g., Turner v Safely*, 482 US 78, 95 (1987) ("[T]he decision to marry is a fundamental right" and marriage is an "expression[ ] of emotional support and public commitment."); *Zablocki*, 434 US at 384 (1978) ("The right to marry is of fundamental importance for all individuals.") As such, a court might well apply strict scrutiny. Under a strict-scrutiny analysis, Oregon's constitutional prohibition on recognition of out-of-state same-sex marriages would be struck down unless a court concluded that it was narrowly drawn to serve a compelling governmental interest. If we cannot articulate a rational-basis-level defense of the law (and we cannot), we certainly will fail on the vastly higher strict-scrutiny standard.

We note that the federal district court for the northern district of California considered these federal constitutional issues in respect to a voter initiative to deny same-sex marriage to California couples, and did so on the basis of a lengthy and well-developed record. *Perry v. S Schwarzenegger*, 704 F Supp 921, 940 (N.D. Cal 2010). The District Court—and, on appeal, the Ninth Circuit— concluded that the California law had no rational basis. Both courts found that the California law's withdrawal of the right to same-sex marriage, allowing only same-sex civil unions, served no purpose and had no effect other than to lessen the status and human dignity of gays and lesbians in California and to classify their relationships as inferior to opposite-sex couples. *Perry v. Brown*, 671 F3d 1051 (9th Cir 2012).[4] Although the Ninth Circuit's opinion turned in large part on the particular circumstances of California first allowing and then prohibiting same-sex marriage, the lower court's thoughtful opinion provides a strong basis for anticipating the likely reaction of Oregon courts to the question presented here.

## CONCLUSION

Across the country, courts, legislatures, and the people through their initiative processes are addressing whether states may refuse to create valid same-sex marriages. While that larger question must await resolution for another day, it is legally defensible for Oregon agencies to recognize same-sex marriages validly performed in other jurisdictions.

Sincerely,

*Mary H Williams*

MARY H. WILLIAMS
Deputy Attorney General

---

[4] While the United States Supreme Court accepted review of that decision, it did not reach the merits, as it concluded that the proper party had not appealed. *Hollingsworth v. Perry*, 570 US __, 133 S Ct 2652 (2013).

# CENSUS SNAPSHOT



## OREGON

FEBRUARY 2008

**Adam P. Romero**, *Public Policy Fellow*
**Clifford J. Rosky**, *Research Fellow*
**M.V. Lee Badgett**, *Research Director*
**Gary J. Gates**, *Senior Research Fellow*



Same-sex couple households per 1,000 households
- None present: 0
- Low: 0.01 – 2.99
- Med: 3 – 4.99
- High: 5+

Using data from the U.S. Census Bureau, this report provides demographic and economic information about same-sex couples and same-sex couples raising children in Oregon. We compare same-sex "unmarried partners," which the Census Bureau defines as an unmarried couple who "shares living quarters and has a close personal relationship," to different-sex married couples in Oregon.[1]

In many ways, the almost 11,000 same-sex couples living in Oregon are similar to married couples. According to Census 2000, they live throughout the State, are racially and ethnically diverse, have partners who depend upon one another financially, and actively participate in Oregon's economy. Census data also show that 19% of same-sex couples in Oregon are raising children, and they have similar economic resources to provide for their families as married couples.

### SAME-SEX COUPLES AND THE LGBT POPULATION IN OREGON

- In 2000, there were 8,932 same-sex couples living in Oregon.[2]

- By 2005, the number of same-sex couples increased to 10,899.[3] This increase likely reflects same-sex couples' growing willingness to disclose their partnerships on government surveys.

- In 2005, there were an estimated 121,645 gay, lesbian, and bisexual people (single and coupled) living in Oregon.[4]

### INDIVIDUALS IN SAME-SEX COUPLES ARE DEMOGRAPHICALLY AND GEOGRAPHICALLY DIVERSE

- There are more female same-sex couples (57%) than male same-sex couples (43%) in Oregon.[5]

- Individuals in same-sex couples are, on average, 40 years old, and significantly younger than individuals in married couples (48 years old) in Oregon.

- Same-sex couples live in every county in Oregon and constitute 1.1% of coupled households and 0.7% of all households in the state. Multnomah County reported the most same-sex couples with 3,263 couples (1.20% of all households in the county), followed by Lane County with 957 couples (0.73%), and Washington County with 943 couples (0.56%). The counties with the highest percentage of same-sex couples are Multnomah County (1.20% of all county households), Lane County (0.73%), Lincoln County (0.70%), and Jackson County (0.65%).[6]

- Oregon's same-sex couples are as racially and ethnically diverse as their married counterparts: 10% of individuals in same-sex couples are nonwhite, compared to 11% of married individuals.

### PEOPLE IN SAME-SEX COUPLES ARE ACTIVELY ENGAGED IN THE STATE ECONOMY

- Individuals in same-sex couples in Oregon are significantly more likely to be employed than are married individuals: 80% of individuals in same-sex couples are employed, compared to 65% of married individuals.

- Contrary to a popular stereotype, the annual earnings of men in same-sex couples are significantly lower than those of married men. On average, men in same-sex couples in Oregon earn $36,756 each year, significantly less than $45,317 for married men. The median income of men in same-sex couples in Oregon is $33,000, or 8% less than that of married men ($36,000).

- Women in same-sex couples in Oregon earn an average of $30,672 per year (with a median of $30,000), more than married women, whose earnings average $23,908 (with a median of $20,000). Women in same-sex couples earn less than married men as well as men in same-sex couples.



Average Individual Earnings

- Individuals in same-sex couples in Oregon are more likely to work in the public sector: 22% of individuals in same-sex couples work in the public sector, compared to 16% of married individuals; 65% of individuals in same-sex couples work in the private sector, compared to 67% of married individuals; and 13% of individuals in same-sex couples are self-employed, compared to 16% of married individuals.

- Individuals in same-sex couples are significantly more likely to have a college degree: 45% of individuals in same-sex couples and 26% of married individuals have earned a college degree.

- Despite the military's historic policies of excluding gay men and lesbians from service, individuals in same-sex couples have served in the military: 9% of individuals in same-sex couples are veterans, compared to 19% of married individuals.

### SAME-SEX PARTNERS IN OREGON DEPEND UPON ONE ANOTHER IN WAYS THAT ARE SIMILAR TO MARRIED COUPLES

- Couples in which one partner does not work or earns significantly less than the other partner may indicate financial interdependence. 22% of same-sex couples have only one wage earner, compared to 31% of married couples.

- The income gap between same-sex partners is $20,188, compared to $26,529 for married spouses.

- 24% of same-sex couples have at least one partner who is disabled, compared to 29% of married couples.

- 5% of same-sex couples have at least one partner who is age 65 or older, compared to 19% of married couples.

### SAME-SEX HOUSEHOLDS IN OREGON HAVE SIMILAR ECONOMIC RESOURCES AS MARRIED HOUSEHOLDS

- The median income of same-sex coupled households in Oregon is $60,900, compared to $54,600 for married couples. The average household income of same-sex couples is $67,975, compared to $67,929 for married couples.



Household Incomes

- Same-sex couples are significantly less likely than married couples to own their homes: 66% of same-sex couples in Oregon own their home, compared to 80% of married couples.

### SAME-SEX COUPLES ARE RAISING CHILDREN IN OREGON WITH SIMILAR ECONOMIC RESOURCES AS MARRIED PARENTS

- About 19% of same-sex couples in Oregon are raising children under the age of 18.

- As of 2005, an estimated 3,207 of Oregon's children are living in households headed by same-sex couples.[7]

- In Oregon, married and same-sex couples with children under 18 in the home have, on average, 2 children.

- More than 5% of Oregon's adopted children (or 1,232 children) live with a lesbian or gay parent.[8]

- 38% of Oregon's same-sex parents have only one wage earner, compared to 36% of married parents.

- Same-sex parents in Oregon have similar financial resources to support their children as married parents. The median household income of same-sex couples with children is $60,000, compared to $56,900 for married parents. The average household income of same-sex couples with children is $66,350, compared to $69,100 for married parents.

- While 56% of same-sex couples with children own their home, a significantly larger percentage of married parents (73%) own their home.



Household (With Children) Incomes

## CONCLUSION

Census data provide valuable information about gay and lesbian couples in Oregon. In many respects, Oregon's same-sex couples are similar to married couples. Many same-sex couples in Oregon are raising children, and they have similar economic resources as married couples to provide for their families.

### Table One: Characteristics of individuals in couples

|  | Same-Sex | Married |
|---|---|---|
| Race/Ethnicity[a] |  |  |
| White | 89.6% | 88.2% |
| Black | 2.7% | 0.8%* |
| Hispanic | 3.8% | 5.4% |
| Asian | 0.4% | 2.9%* |
| American Indian/Alaskan Native | 1.5% | 0.8%* |
| Other | 2.0% | 1.8% |
| Average age | 40.2 | 48.2* |
| Percent with a college degree or better | 44.7% | 26.4%* |
| Percent Employed | 80.3% | 64.6%* |
| Employment[a] |  |  |
| Private employer | 64.7% | 67.2% |
| Public employer | 21.8% | 16.3%* |
| Self-employed | 13.5% | 16.1% |
| Veteran Status | 9.2% | 18.6%* |
| Average individual salary |  |  |
| Men | $36,756 | $45,317* |
| Women | $30,672 | $23,908* |
| Median individual salary |  |  |
| Men | $33,000 | $36,000 |
| Women | $30,000 | $20,000 |

\* Difference significant at the 5% level or better (two-tailed tests).
^ Difference significant at the 10% level or better (two-tailed tests).

### Table Two: Characteristics of couples

|  | Same-Sex | Married |
|---|---|---|
| At least one partner 65 or older | 4.9% | 19.5%* |
| Percent disabled | 24.2% | 28.6% |
| Average household income | $67,975 | $67,929 |
| Median household income | $60,900 | $54,600 |
| Income gap between partners | $20,188 | $26,529* |
| Single wage earner | 21.7% | 30.6%* |
| Homeownership | 66.1% | 79.5%* |
| Percent with children under 18 | 18.9% | 45.4%* |

\* Difference significant at the 5% level or better (two-tailed tests).
^ Difference significant at the 10% level or better (two-tailed tests).

### Table Three: Characteristics of couples with children

|  | Same-Sex parents | Married parents |
|---|---|---|
| Average number of children under 18 in the household | 1.6 | 2.0* |
| Single wage earner (parents) | 38.1% | 35.9% |
| Average household income (parents) | $66,350 | $69,100 |
| Median household income (parents) | $60,000 | $56,900 |
| Homeownership | 56.2% | 73.4%* |

\* Difference significant at the 5% level or better (two-tailed tests).
^ Difference significant at the 10% level or better (two-tailed tests).

### Appendix A: Counts and percent of same-sex couples by county

| County | Number of same-sex couples | Percent of same-sex couples out of all households |
|---|---|---|
| Baker | 29 | 0.42% |
| Benton | 188 | 0.62% |
| Clackamas | 693 | 0.54% |
| Clatsop | 75 | 0.51% |
| Columbia | 66 | 0.40% |
| Coos | 135 | 0.52% |
| Crook | 32 | 0.44% |
| Curry | 50 | 0.52% |
| Deschutes | 231 | 0.51% |
| Douglas | 167 | 0.42% |
| Gilliam | 2 | 0.24% |
| Grant | 8 | 0.25% |
| Harney | 9 | 0.30% |
| Hood River | 29 | 0.40% |
| Jackson | 468 | 0.65% |
| Jefferson | 34 | 0.51% |
| Josephine | 155 | 0.50% |
| Klamath | 98 | 0.39% |
| Lake | 10 | 0.32% |
| Lane | 957 | 0.73% |
| Lincoln | 135 | 0.70% |
| Linn | 127 | 0.32% |
| Malheur | 31 | 0.30% |
| Marion | 541 | 0.53% |
| Morrow | 11 | 0.29% |
| Multnomah | 3263 | 1.20% |
| Polk | 114 | 0.49% |
| Sherman | 1 | 0.13% |
| Tillamook | 40 | 0.39% |
| Umatilla | 107 | 0.42% |
| Union | 40 | 0.41% |
| Wallowa | 10 | 0.33% |
| Wasco | 30 | 0.32% |
| Washington | 943 | 0.56% |
| Wheeler | 3 | 0.46% |
| Yamhill | 100 | 0.35% |

**About the Authors**

**Adam P. Romero** is Public Policy Fellow at the Williams Institute, UCLA School of Law. J.D. Yale Law School; A.B., *summa cum laude*, Cornell University. His current research examines the significance of family in society and law, especially as relevant to disabled adults without family.

**Clifford J. Rosky** is Research Fellow at the Williams Institute, UCLA School of Law. J.D. Yale Law School; B.A., *summa cum laude*, Amherst College. His current research examines the significance of gender in family law cases involving lesbian and gay parents.

**M.V. Lee Badgett** is Research Director at The Williams Institute, UCLA School of Law, and Director of the Center for Public Policy and Administration at the University of Massachusetts Amherst, where she is also on the faculty of the Department of Economics. PhD U.C. Berkeley. She studies family policy and employment discrimination related to sexual orientation.

**Gary J. Gates** is Senior Research Fellow at The Williams Institute, UCLA School of Law. PhD Carnegie Mellon. He studies the demographic and economic characteristics of the lesbian and gay population.

---

[1] Unless otherwise noted, we calculate the demographic characteristics from the Census 2000 Public Use Microdata Sample (5% file) available from the U.S. Census Bureau. For a detailed discussion of the Census 2000 methodology used in this report, see *Census Snapshot: Methods Note, available at* http://www.law.ucla.edu/williamsinstitute/publications/MethodologicalDetailsForCensusSnapshots.pdf. In estimating numbers of same-sex couples and children raised by same-sex couples, however, we use the total number of same-sex couples from 2005 and the proportion of couples with children from 2000 in order to provide a more up-to-date estimate.

[2] Tavia Simmons & Martin O'Connell, U.S. Department of Commerce, U.S. Census Bureau, *Married-Couple and Unmarried-Partner Households*, Census 2000 Special Reports, CENSR-5, p. 4, tab. 2 (Feb. 2003).

[3] Gary J. Gates, The Williams Institute, *Same-sex Couples and the Gay, Lesbian, Bisexual Population: New Estimates from the American Community Survey*, p. 11, apx. 1, *available at* http://www.law.ucla.edu/williamsinstitute/publications/SameSexCouplesandGLBpopACS.pdf. Sample sizes for individual states in 2005 are not sufficiently large for the analyses presented in this report, we therefore use data from Census 2000 where samples are on average five times larger than 2005.

[4] *Id.*

[5] Simmons & O'Connell, *supra* note 2.

[6] U.S. Census Bureau, *Unmarried Partner Households by Sex of Partners*, PCT14. Percentages of total households computed by dividing data in PCT14 by data in P15 (total households).

[7] Computed by multiplying the number of same-sex couples times the percent of same-sex couples with children times the average number of children under 18 in the household.

[8] Gary J. Gates, M.V. Lee Badgett, Kate Chambers, Jennifer Macomber, The Williams Institute & The Urban Institute, *Adoption and Foster Care by Gay and Lesbian Parents in the United States* (2007), *available at* http://www.law.ucla.edu/Williamsinstitute/publications/Policy-Adoption-index.html.

[9] Due to rounding, percent may not add to 100.

For more information, contact:
**The Williams Institute**
UCLA School of Law
Box 951476
Los Angeles, CA 90095-1476
T (310)267-4382
F (310)825-7270
williamsinstitute@law.ucla.edu
www.law.ucla.edu/williamsinstitute