Amy Joseph Pedersen, OSB No. 853958
ajpedersen@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Leonard J. Feldman, WSBA #20961 *(pro hac vice pending)*
ljfeldman@stoel.com
James Will Eidson, WSBA #45040 *(pro hac vice pending)*
jweidson@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900

Attorneys for Amici Curiae

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| DEANNA L. GEIGER and JANINE M. NELSON, ROBERT DUEHMIG and WILLIAM GRIESAR,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN KITZHABER, in his official capacity as Governor of Oregon; ELLEN ROSENBLUM, in her official capacity as Attorney General of Oregon; JENNIFER WOODWARD, in her official capacity as State Registrar, Center for Health Statistics, Oregon Health Authority; and RANDY WALRUFF, in his official capacity as Multnomah County Assessor,<br><br>Defendants. | Case No.: 6:13-cv-1834-MC<br>(Lead Case)<br><br>**BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS**<br><br>**(LIST OF *AMICI* BELOW)** |

Page i  -  BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

75614656.13 0063718-00184

|   |   |
|---|---|
| PAUL RUMMELL and BENJAMIN WEST; LISA CHICKADONZ and CHRISTINE TANNER; and BASIC RIGHTS EDUCATION FUND, | Case No.: 6:13-cv-02256-MC |

   Plaintiffs,

   v.

JOHN KITZHABER, in his official capacity as Governor of Oregon; ELLEN ROSENBLUM, in her official capacity as Attorney General of Oregon; JENNIFER WOODWARD, in her official capacity as State Registrar, Center for Health Statistics, Oregon Health Authority; and RANDY WALRUFF, in his official capacity as Multnomah County Assessor,

   Defendants.

## *Amici*

| | |
|---|---|
| NIKE, Inc. | Standard Insurance Company |
| NW Natural | Oregon Health & Science University |
| Portland General Electric Company | Columbia Sportswear Company |
| Neil Kelly Company | Powell's Books |
| Weinstein PR | Medford Fabrication |
| Morel Ink | Russell Development Company |
| Gerding Edlen | Torpet LLC |
| Oregon Business Association | The Portland Business Alliance |
| HM3 Energy, Inc. | Portland Public Schools |
| Intel Corporation | Kaiser Foundation Health Plan, Inc. |
| Oregon State University | salesforce.com, Inc. |
| Portland Timbers | Gard Communications |
| Tonkon Torp | Celilo Group Media, Inc. |
| Portland State University | Starbucks Coffee Company |
| PECI | Moda Health |
| Northwest Evaluation Association | EDJE Consulting |
| Christopher David Experience Design | University of Oregon |
| Autodesk, Inc. | Jubitz Family Foundation |

Page ii  -  BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

75614656.13 0063718-00184

# TABLE OF CONTENTS

I. INTRODUCTION .......................................................................................................... 7
II. ARGUMENT ................................................................................................................ 9
   A. Granting Plaintiffs' Motion For Summary Judgment Is Necessary To Bring Oregon Law Into Alignment With The Values And Corporate Principles Of Oregon Employers. ........................................................................................................ 9
   B. Granting Plaintiffs' Motion For Summary Judgment Will Allow Oregon Employers To Be More Competitive, More Efficient, And More Productive. ................... 8
III. CONCLUSION ........................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Baehr v. Lewin*,
   852 P.2d 44, *reconsideration and clarification granted in part*, 875 P.2d 225
   (Haw. 1993) ........................................................................................................................3

*Bishop v. United States ex rel. Holder*,
   No. 04-cv-848-TCK-TLW, 2014 WL 116013 (N.D. Okla. Jan. 14, 2014) ..............................4

*Bostic v. Rainey*,
   No. 2:13-cv-395, 2014 WL 561978 (E.D. Va. Feb. 13, 2014) ................................................4

*Bourke v. Beshear*,
   No. 3:13-CV-750-H, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014).................................1, 4, 5

*Bowers v. Hardwick*,
   478 U.S. 186 (1986)................................................................................................................7

*Brown v. Board of Education of Topeka*,
   347 U.S. 483 (1954)................................................................................................................6

*Craig v. Boren*,
   429 U.S. 190 (1976)................................................................................................................7

*De Leon v. Perry*,
   No. SA-13-CA-00982-OLG, 2014 WL 715741 (W.D. Tex. Feb. 26, 2014)...........................3

*DeBoer v. Snyder*,
   No. 12–CV–10285, 2014 WL 1100794 (E.D. Mich. Mar. 21, 2014).......................................3

*Dothard v. Rawlinson*,
   433 U.S. 321 (1977)................................................................................................................7

*Frontiero v. Richardson*,
   411 U.S. 677 (1973)................................................................................................................7

*Gideon v. Wainwright*,
   372 U.S. 335 (1963)................................................................................................................5

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)...........................................................................................................9, 10

*Heart of Atlanta Motel, Inc. v. United States*,
   379 U.S. 241 (1964)................................................................................................................7

*Kitchen v. Herbert*,
  No. 2:13-cv-217, 2013 WL 6697874 (D. Utah Dec. 20, 2013)..................3

*Lawrence v. Texas*,
  539 U.S. 558 (2003).................................................................................6, 7

*Lee v. Orr*,
  No. 13-cv-8719, 2014 WL 683680 (N.D. Ill. Feb. 21, 2014)......................4

*Loving v. Virginia*,
  388 U.S. 1 (1967)..........................................................................................6

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803)...................................................5

*Obergefell v. Wymyslo*,
  No. 1:13-cv-501, 2013 WL 6726688 (S.D. Ohio Dec. 23, 2013).................4

*Plessy v. Ferguson*,
  163 U.S. 537 (1996).....................................................................................6

*Powell v. State of Alabama*,
  287 U.S. 45 (1932).......................................................................................5

*Reed v. Reed*,
  404 U.S. 71 (1971).......................................................................................7

*Regents v. Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978).....................................................................................7

*Romer v. Evans*,
  517 U.S. 620 (1996).....................................................................................6

*Shelley v. Kraemer*,
  334 U.S. 1 (1948).........................................................................................7

*United States v. Virginia*,
  518 U.S. 515 (1996).....................................................................................7

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943).....................................................................................1

**Constitutional Provisions**

U.S. Const., amend. XIV ....................................................................................6

**Other Authorities**

Feng Li & Venky Nagar, *Diversity and Performance*, 59 Management Science
    529, 543 (Mar. 2003) ...................................................................................... 9, 13

Freedom to Marry, *States*, http://www.freedomtomarry.org/states ............................... 10

Level Playing Field Institute, *The Corporate Leavers Survey: The Cost of
    Employee Turnover Due Solely to Unfairness in the Workplace* 4 (2007),
    *available at* http://www.lpfi.org/sites/default/files/corporate-leaevers-
    survey.pdf ........................................................................................................... 11

Marian Moser Jones, *Will Same-Sex-Marriage Rulings Lead to an LGBT Brain
    Drain in Some States?*, The Chronicle of Higher Education (June 27, 2013) ........ 11

Nick Anderson, *Outgoing rector warns Virginia may lose professors because of
    gay marriage ban*, The Washington Post (Aug. 12, 2013) ....................................... 11

NIKE, Inc., Diversity & Inclusion, http://nikeinc.com/pages/diversity-inclusion
    (last visited Mar. 24, 2014) ...................................................................................... 4

NW Natural, Company Culture,
    https://www.nwnatural.com/aboutnwnatural/thecompany/careers/companycult
    ure (last visited Mar. 25, 2014) ................................................................................ 4

Oregon Health & Science University, Center for Diversity & Inclusion,
    http://www.ohsu.edu/xd/about/vision/center-for-diversity-inclusion/index.cfm
    (last visited Mar. 24, 2014) ...................................................................................... 4

Out & Equal Workplace Advocates, HarrisInteractive & Witeck Combs
    Communications, *Majority of Americans: Companies Not Government Should
    Decide Benefits Offered to Same-Sex Employees* 1 (May 22, 2006), *available
    at* http://outandequal.org/documents2006_Workplace_Survey052306.pdf .......... 10

Sorcha Pollak, *And the State with the Highest Proportion of Openly Gay
    Residents Is...*, Time NewsFeed (Feb. 21, 2013), http://newsfeed.time.-
    com/2013/02/21/and-the-state-with-the-highest-proportion-of-openly-gay-
    residents-is/ ............................................................................................................. 9

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).

## I. INTRODUCTION

*Amici* here are 36 Oregon employers that recognize the significant harm caused by prohibiting same-sex marriages in Oregon and refusing to recognize same-sex marriages under the laws of other states. They submit this brief in accordance with the Court's February 13, 2014 Order, which established April 1 as the deadline for amicus briefs. All parties have consented to the submission of this brief.

As the Supreme Court recognized more than 70 years ago in *Barnette* (quoted above) and in other similar opinions (discussed in the argument below), the judiciary has a critical role in protecting core civil rights. When such rights are at issue – as they are here – courts rise above politics to ensure that "the will of the majority" does not "forever close the door to a minority, no matter how disliked, to any right or privilege." *Bourke v. Beshear*, No. 3:13-CV-750-H, 2014 WL 556729, *6 n.15 (W.D. Ky. Feb. 12, 2014). The Supreme Court has done so repeatedly, on subjects ranging from laws that perpetuated racial segregation, to laws that discriminated against women, to laws that criminalized sexual conduct between two persons of the same sex. In those circumstances, federal courts have appropriately protected our constitutional rights *consistent with the evolving views of society*. This, in turn, has allowed our society to flourish.

Page 7  -  BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

This case, too, calls for decisive judicial action. Oregon law, unlike that of many other states and numerous other countries, prohibits marriage between same-sex individuals and denies same-sex couples the same rights and privileges as other similarly situated couples. Such a result is unconstitutional – as cogently argued in plaintiffs' motion for summary judgment. It is also flatly inconsistent with *Amici*'s values and corporate principles, which appropriately recognize that marriage equality is the right thing to do, both morally and legally. Just as our society has rejected racial and gender discrimination, so too have *Amici* rejected discrimination that is based on sexual orientation.

This amicus brief describes and summarizes *Amici*'s values and corporate principles and explains how those principles are inconsistent with discriminatory treatment of same-sex couples. It also describes how such treatment causes very real harm to Oregon businesses, including *Amici*. Oregon businesses must attract and retain the best employee talent to compete effectively in a national and global economy. That effort is made more challenging in states, like Oregon, where employees who are or will be in a same-sex relationship are discriminated against. And even when such talented employees remain in Oregon, the disparate treatment of similarly situated employees forces *Amici* to operate in a complicated landscape of laws and human resources regulations. *Amici* involuntarily become the face of discrimination based on sexual orientation when they are forced to administer benefits differently for employees with a same-sex spouse in order to comply with Oregon law (*e.g.*, income tax law). That imposes additional confusion, costs, and administrative burdens, which further harm Oregon businesses and their employees.

Page 8   -   BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

This brief describes these harms in greater detail, providing yet another reason why this Court should end this system of forced discrimination by Oregon businesses. For these additional reasons, the Court should grant plaintiffs' motion for summary judgment.

## II. ARGUMENT

A. **Granting Plaintiffs' Motion For Summary Judgment Is Necessary To Bring Oregon Law Into Alignment With The Values And Corporate Principles Of Oregon Employers.**

Until approximately 1993, when the Hawaii Supreme Court recognized that prohibiting same-sex marriage might be unconstitutional, American society largely viewed marriage as being between a man and a woman. *Baehr v. Lewin*, 852 P.2d 44, *reconsideration and clarification granted in part*, 875 P.2d 225 (Haw. 1993). Oregon, too, has historically limited marriages to opposite-sex relationships and has refused to recognize same-sex marriages under the laws of other states. But as the gay rights movement grew in the 1970s, 1980s, and 1990s, activists increasingly advocated for equal recognition of same-sex marriages. Beginning in the 1990s, states, largely driven by courts, began making strides towards marriage equality.

Societal views have steadily evolved toward marriage equality. Today, six states have legalized same-sex marriage through state-court decisions (California, Connecticut, Iowa, Massachusetts, New Jersey, and New Mexico), eight states have passed same-sex marriage legislation (Delaware, Hawaii, Illinois, Minnesota, New Hampshire, New York, Rhode Island, and Vermont), and three states have legalized same-sex marriage through popular vote (Maine, Maryland, and Washington). *See Kitchen v. Herbert*, No. 2:13-cv-217, 2013 WL 6697874, at *5 n.4 (D. Utah Dec. 20, 2013). And at least seven federal courts have issued decisions holding that it is unconstitutional to prohibit same-sex marriage. *See DeBoer v. Snyder*, No. 12–CV–10285, 2014 WL 1100794 (E.D. Mich. Mar. 21, 2014); *De Leon v. Perry*, No. SA-13-CA-00982-OLG,

Page 9   -   BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

2014 WL 715741 (W.D. Tex. Feb. 26, 2014); *Lee v. Orr*, No. 13-cv-8719, 2014 WL 683680 (N.D. Ill. Feb. 21, 2014) (applied only to Cook County, Illinois); *Bostic v. Rainey*, No. 2:13-cv-395, 2014 WL 561978 (E.D. Va. Feb. 13, 2014); *Bourke v. Beshear*, No. 3:13-CV-750-H, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014); *Bishop v. United States ex rel. Holder*, No. 04-cv-848-TCK-TLW, 2014 WL 116013 (N.D. Okla. Jan. 14, 2014); *Obergefell v. Wymyslo*, No. 1:13-cv-501, 2013 WL 6726688 (S.D. Ohio Dec. 23, 2013).

*Amici* wholeheartedly agree with, and support, this movement toward equality in general and marriage equality in particular. Many of the *Amici* have publically announced that support on their websites and in other public policy statements. For example, NIKE states on its website:

> *Most companies embrace diversity.*
>
> *Not Nike.*
>
> *We soak it up. We squeeze it out. We want it to drip over everything Nike does. Because without diversity of opinion, . . . of background, . . . of perspective, the Idea grows fallow. Or worse, it vanishes altogether. The mission is to harness diversity and inclusion to inspire ideas and ignite innovation.*

NIKE, Inc., Diversity & Inclusion, http://nikeinc.com/pages/diversity-inclusion (last visited Mar. 24, 2014). Other *Amici* have similar policy statements:

- On its website, Oregon Health & Science University states: "Diversity is key to maintaining a competitive workforce advantage. Integrating diversity within all areas of the university and all parts of our mission is critical to OHSU's strategic goal of being a great organization, diverse in people and ideas. Oregon Health & Science University, Center for Diversity & Inclusion, http://www.ohsu.edu/xd/about/vision/center-for-diversity-inclusion/index.cfm (last visited Mar. 24, 2014).

- The Vision Statement for NW Natural's Diversity and Inclusion Council states: "NW Natural supports an environment for its employees that creates opportunities, encourages respect and trust, and values diversity and an inclusive teamwork approach. Such an environment contributes to the success of the organization and its employees and is essential to the service we provide to our customers and communities." NW Natural, Company Culture,

> https://www.nwnatural.com/aboutnwnatural/thecompany/careers/companyculture (last visited Mar. 25, 2014).

- Standard Insurance Company's recruiting materials and new employee orientation manual state: "At The Standard, caring about people is good business. To create a culture of inclusion we strive to engage each individual and make people feel valued and essential to the success of the organization."

These statements reflect the *unanimous view* of *Amici* regarding diversity and inclusivity, and that viewpoint drives their corresponding support for marriage equality.

As noted previously, the judiciary has a critical role in acknowledging and protecting our constitutional rights consistent with the evolving views of society. As Chief Justice John Marshall proclaimed more than 200 years ago in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803), "[i]t is emphatically the province and duty of the judicial department to say what the law is." It is necessary for courts to undertake this duty because "[h]istory has already shown us that, while the Constitution itself does not change, our understanding of the meaning of its protections and structure evolves." *Bourke*, 2014 WL 556729, at *11.

Several Supreme Court opinions illustrate this point. In *Powell v. State of Alabama*, 287 U.S. 45, 59 (1932), for example, the Supreme Court described the denial of counsel to defendants in criminal proceedings as "one of the grave evils of our time." After listing the many states that had already recognized the right to counsel in criminal proceedings, the Court held that *all* criminal defendants are entitled to legal counsel. *Id.* at 58-59. To deny defendants such a right, the Court noted, "is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob." *Id.* at 59. The Supreme Court reaffirmed that view 30 years later in *Gideon v. Wainwright*, 372 U.S. 335 (1963), which is now synonymous with the right to counsel in criminal proceedings.

Page 11 -  BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

The Supreme Court's landmark opinion in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954), is also instructive here. The Court there noted that "we cannot turn the clock back to 1868 when the [Thirteenth] Amendment was adopted, or even to 1896 when *Plessy v. Ferguson* was written. We must consider public education in the light of its full development and its present place in American life throughout the Nation." *Id.* at 492-93. Focusing on *current views* regarding public education, the Court squarely held that segregation in public schools violates the Fourteenth Amendment of the United States Constitution and therefore would no longer be permitted in any state.

The Supreme Court's jurisprudence in the areas of marriage and sexual orientation is no different. Almost 50 years ago, in *Loving v. Virginia*, 388 U.S. 1, 11 (1967), the Supreme Court squarely held that Virginia's refusal to allow mixed-race marriage violated equal protection principles. As of the date of the decision in *Loving*, 14 states had already repealed laws prohibiting mixed-race marriage. 388 U.S. at 6 n.5. Just as *Brown* did with regard to segregation in public schools, the *Loving* decision marked a sea change in constitutional jurisprudence regarding the fundamental right to marry consistent with the enlightened views of society.

More recently, in *Romer v. Evans*, 517 U.S. 620, 635 (1996), the Supreme Court struck down as unconstitutional Colorado's constitutional amendment prohibiting all legislative, executive, or judicial action designed to protect homosexual persons. In *Lawrence v. Texas*, 539 U.S. 558, 559 (2003), the Supreme Court similarly looked to our society's "emerging awareness" regarding homosexuality and struck down as unconstitutional a Texas statute forbidding sexual conduct between two persons of the same sex. Critical to the Court's analysis was its recognition that most states had abandoned or no longer enforced such laws:

Page 12 -   BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

75614656.13 0063718-00184

> The 25 States with laws prohibiting the relevant conduct referenced in the *Bowers* decision are reduced now to 13, of which 4 enforce their laws only against homosexual conduct. In those States where sodomy is still proscribed, whether for same-sex or heterosexual conduct, there is a pattern of nonenforcement with respect to consenting adults acting in private.

*Id.* at 573. Consistent with that emerging view, the Court expressly overruled its contrary decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986), decided less than 20 years earlier, and noted that "[h]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." *Lawrence*, 539 U.S. at 572.

Indeed, the Supreme Court has *repeatedly* protected our constitutional rights consistent with society's evolving views. Other relevant decisions include:

- *Shelley v. Kraemer*, 334 U.S. 1 (1948) (prohibiting courts from enforcing restrictive covenants that prevent people of a certain race from owning or occupying property);

- *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) (holding that federal civil rights laws apply to all businesses participating in interstate commerce);

- *Reed v. Reed*, 404 U.S. 71 (1971) (holding that law discriminating against women is unconstitutional);

- *Frontiero v. Richardson*, 411 U.S. 677 (1973) (striking down a federal statute that automatically granted male members of the uniformed services housing and benefits for their wives, but required female members to demonstrate "actual dependency" of their husbands to qualify for the same benefit);

- *Craig v. Boren*, 429 U.S. 190 (1976) (adopting a "heightened scrutiny" standard of review to evaluate legal distinctions based on gender);

- *Dothard v. Rawlinson*, 433 U.S. 321 (1977) (invalidating Alabama's height and weight requirements for prison guards that had the effect of excluding the majority of females);

- *Regents v. Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) (finding affirmative action unfair if it resulted in reverse discrimination); and

- *United States v. Virginia*, 518 U.S. 515 (1996) (ruling that the all-male Virginia Military Institute's discriminatory admissions policy violated women's equal protection rights).

In each of these cases, the Supreme Court rose above the vicissitudes of political controversy and established fundamental constitutional rights that reflected, and were consistent with, society's *modern* and *enlightened* values.

These cases, and the constitutional principles that animated the Court in each case, require that Oregon's marriage exclusion be stricken as unconstitutional. As Oregon law now stands, it prohibits same-sex marriage and does not recognize same-sex marriages under the laws of other states. Such a view is flatly inconsistent with the views of *Amici*. Consistent with those views – and the values and corporate principles of Oregon employers – the Court should grant Plaintiffs' motion for summary judgment so that Oregon law no longer discriminates against employees and other individuals who are or will be in a same-sex relationship.

**B.     Granting Plaintiffs' Motion For Summary Judgment Will Allow Oregon Employers To Be More Competitive, More Efficient, And More Productive.**

The discussion in Section II.A above is based on noneconomic issues: the fundamental disparity between Oregon's marriage exclusion, which discriminates against same-sex couples, and *Amici*'s values and corporate principles, which celebrate diversity and inclusivity. But Oregon's marriage exclusion also has a very real *economic* cost to *Amici* and other Oregon employers. The discussion below describes how and why that is so.

To begin with, Oregon's marriage exclusion sometimes requires *Amici* and other Oregon employers to differently administer benefits for employees who are or will be in a same-sex relationship as compared to employees who are or will be in a different-sex relationship. Under federal and state law, *Amici* offer their employees numerous benefits and protections relating to health care, parental leave, and retirement. But in some instances, to comply with state and federal laws regarding each such benefit, *Amici* are unable to offer the same benefits and protections to employees who are in a same-sex relationship. For instance, as noted in the

Page 14 -   BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF
                     PLAINTIFFS

Declaration of Nicola Cowie (Dkt. 42), submitted in support of plaintiffs' motion for summary judgment, Ms. Cowie was denied spousal health insurance coverage by her employer because her same-sex marriage is not recognized in Oregon.

What makes this discriminatory treatment even worse is that *Amici* are often forced to implement it. *Amici*, in effect, become the unwilling face of marriage inequality in the eyes of their current and potential employees. As one study reported, "[a]n organization's policies toward its employees, whether an inclusive healthcare policy or a discriminatory promotion and hiring policy, send latent signals to the entire organization regarding permissible biological and behavioral attributes." Feng Li & Venky Nagar, *Diversity and Performance*, 59 Management Science 529, 543 (Mar. 2003) ("*Diversity and Performance*"). This is a significant concern, as Oregon has one of the largest openly gay and lesbian populations in the country (number five). Sorcha Pollak, *And the State with the Highest Proportion of Openly Gay Residents Is…*, Time NewsFeed (Feb. 21, 2013), http://newsfeed.time.com/2013/02/21/and-the-state-with-the-highest-proportion-of-openly-gay-residents-is/.

Because Oregon law discriminates against actual and prospective employees who are or will be in a same-sex relationship, it is significantly harder for *Amici* and other Oregon employers to recruit and hire those employees. In *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003), the Supreme Court aptly recognized that "the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Amici* constantly strive to recruit and hire such people. But those individuals have choices: they can choose to work in Oregon, which does not permit or recognize same-sex marriages, or they can choose to work in any one of the 17 other states (a list that continues to

Page 15 - BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF
PLAINTIFFS

75614656.13 0063718-00184

grow) that permit and recognize such marriages. *Amici* believe they are not always able to recruit and hire the very best employees because of Oregon's marriage exclusion.

Here again, this is a very real concern. According to one study, gay and lesbian employees are estimated to make up as much as 14 percent of the workforce. Freedom to Marry, *States*, http://www.freedomtomarry.org/states. In another recent study, 89 percent of survey respondents who identified as gay, lesbian, bisexual, or transgender stated that it was important that they work for a company with a written nondiscrimination policy that includes sexual orientation, and 91 percent said equal benefits were critical. Out & Equal Workplace Advocates, HarrisInteractive & Witeck Combs Communications, *Majority of Americans: Companies Not Government Should Decide Benefits Offered to Same-Sex Employees* 1 (May 22, 2006), *available at* http://outandequal.org/documents2006_Workplace_Survey052306.pdf. *Amici* can control the former – they have written nondiscrimination policies that include sexual orientation – but they cannot control the latter because of Oregon's marriage exclusion.

This issue, importantly, is not limited to potential employees who are or will be in a same-sex relationship. According to the same study discussed above, 72 percent of survey respondents who did *not* identify as gay, lesbian, bisexual, or transgender also found it important that an employer offer equal benefits to *all* co-workers, regardless of sexual orientation. *Id.* These results show that forced discrimination by *Amici* as a result of Oregon's marriage exclusion is not only contrary to *Amici*'s values and corporate principles, but materially impacts their ability to hire and recruit the very best employees and foster a workforce that necessarily includes "widely diverse people, cultures, ideas, and viewpoints." *Grutter*, 539 U.S. at 330.

Moreover, when employees who are or will be in a same-sex relationship do work in Oregon, *Amici* are often unable to retain them. According to another recent survey, this one

focusing on individuals who had left their previous employer, "[g]ay and lesbian professionals and managers said workplace unfairness was the *only* reason they left their employer almost twice as often as heterosexual Caucasian men." Level Playing Field Institute, *The Corporate Leavers Survey: The Cost of Employee Turnover Due Solely to Unfairness in the Workplace* 4 (2007), *available at* http://www.lpfi.org/sites/default/files/corporate-leaevers-survey.pdf. And even more telling, *almost half* of those survey respondents indicated they would have very likely stayed at their job had their employer offered more or better benefits. *Id.* at Executive Summary.

Several prominent authors have confirmed that employee retention is materially impacted by discriminatory treatment of same-sex couples. In a very recent article, the former head of the College of William and Mary's Board of Visitors cautioned:

> We already have lost valued gay and lesbian faculty to our competitors
> who do not discriminate. With changes in federal benefits soon available
> to legally married gay couples, we will lose more. Two able individuals
> told me that they are *leaving for another state* . . . .

Nick Anderson, *Outgoing rector warns Virginia may lose professors because of gay marriage ban*, The Washington Post (Aug. 12, 2013). Similarly, another college professor recently proclaimed:

> While a desire to live full time with my spouse was the main motivator in
> my move from a college in Virginia to one in Maryland, the antigay legal
> environment in Virginia did play a role in my job change.

Marian Moser Jones, *Will Same-Sex-Marriage Rulings Lead to an LGBT Brain Drain in Some States?*, The Chronicle of Higher Education (June 27, 2013). Available information confirms what *Amici* already know: that Oregon's marriage exclusion affects retention as well as recruitment and hiring of diverse and talented employees.

For similar reasons, Oregon's marriage exclusion also interferes with deployment of employees. Many Oregon employers, including *Amici*, have offices and employees located

Page 17 -   BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF
            PLAINTIFFS

75614656.13 0063718-00184

outside of Oregon. At times, it is necessary to ask those employees to relocate to Oregon – sometimes for a few weeks, sometimes longer – to work on certain projects or accomplish certain goals. Employees who are or will be in a same-sex relationship are understandably reluctant to relocate to a state that discriminates against same-sex couples. And given the prevalence of gay and lesbian employees (as high as 14 percent of the workforce, as indicated above), this means that *Amici* and other Oregon employers may be unable to effectively deploy a significant segment of their workforce. This constraint, too, can be eliminated by granting plaintiffs' motion.

In addition to its effect on recruitment, retention, and deployment of talented employees, Oregon's marriage exclusion is also an administrative nightmare because it is both difficult and expensive for *Amici* to operate in this complicated landscape of laws and human resources regulations. The state defendants, in their response to plaintiffs' motion for summary judgment, provide a comprehensive recitation of the complex obligations of employers and uncertain rights of employees resulting from Oregon's marriage exclusion. Dkt. 53 at 8-10. To understand and implement these laws, some *Amici* often must retain costly experts to craft benefits policies and structure compensation systems that provide certain benefits to employees who are based in states that do not discriminate against same-sex couples and more limited benefits to employees who are based in Oregon. Some *Amici* also incur significant costs to educate human resources, benefits, and payroll administrators regarding these differing benefits as well as to administer and manage this complicated web of benefits. Sometimes (though not always) it is possible to compensate employees for the unavailability of certain benefits in Oregon, but those efforts are both expensive and difficult to implement. All of these burdens and expenses can be eliminated by granting plaintiffs' motion.

Page 18 -   BRIEF OF OREGON EMPLOYERS AS AMICI CURIAE IN SUPPORT OF
            PLAINTIFFS

Lastly, Oregon's marriage exclusion also reduces workplace morale and productivity. A 2013 study of 300 firms that adopted same-sex domestic partnership benefits between 1995 and 2008 saw a "significant improvement in operating performance" relative to employers that failed to implement similar policies. *Diversity and Performance* at 538-41. For this reason too, striking down Oregon's marriage exclusion as unconstitutional will have very real benefits for *Amici* as well as for their employees and stockholders.

### III. CONCLUSION

Oregon's marriage exclusion is both morally and legally wrong. By prohibiting same-sex marriages in Oregon and refusing to recognize same-sex marriages under the laws of other states, Oregon requires *Amici* and other Oregon businesses to uphold discriminatory laws that run counter to their values and corporate principles. The marriage exclusion also harms the ability of *Amici* to recruit and retain the best employees, compete effectively in a national and global economy, and achieve full economic growth. It also imposes a significant administrative burden. For all these reasons, as well as those asserted by plaintiffs, *Amici* respectfully urge the Court to join the growing number of courts that have struck down as unconstitutional laws like Oregon's marriage exclusion so that Oregon no longer discriminates against individuals based on sexual orientation.

DATED: April 2, 2014.

STOEL RIVES LLP

*/s/ Amy Joseph Pedersen*

Amy Joseph Pedersen, OSB No. 853958
ajpedersen@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Leonard J. Feldman, WSBA No. 20961
 *(pro hac vice pending)*
James Will Eidson, WSBA No. 45040
 *(pro hac vice pending)*
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900

Attorneys for Amici Curiae