1

```
1              UNITED STATES DISTRICT COURT
                    DISTRICT OF OREGON
2        THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

3    DEANNA L. GEIGER and JANINE M.    )
     NELSON; ROBERT DUEHMIG and WILLIAM )
4    GRIESAR,                          )
                                       )
5                    Plaintiffs,       )
                                       )
6            v.                        ) No. 6:13-cv-01834-MC
                                       )
7    JOHN KITZHABER, in his official   )
     capacity as Governor of Oregon;   )
8    ELLEN ROSENBLUM, in her official  )
     capacity as Attorney General of   )
9    Oregon; JENNIFER WOODWARD, in her )
     official capacity as State        )
10   Registrar, Center for Health      )
     Statistics, Oregon Health         )
11   Authority; and RANDY WALDRUFF, in )
     his official capacity as Multnomah )
12   County Assessor,                  )
                                       )
13                   Defendants.       )
     _____)
14   PAUL RUMMELL and BENJAMIN WEST;   )
     LISA CHICKADONZ and CHRISTINE     )
15   TANNER; BASIC RIGHTS EDUCATION    )
     FUND,                             )
16                                     )
                     Plaintiffs,       )
17                                     )
             v.                        ) No. 6:13-cv-02256-TC
18                                     )
     JOHN KITZHABER, in his official   )
19   capacity as Governor of Oregon;   )
     ELLEN ROSENBLUM, in her official  )
20   capacity as Attorney General of   )
     Oregon; JENNIFER WOODWARD, in her )
21   official capacity as State        )
     Registrar, Center for Health      )
22   Statistics, Oregon Health         )
     Authority; and RANDY WALDRUFF, in )
23   his official capacity as Multnomah )
     County Assessor,                  )
24                                     )
                     Defendants.       )
25   _____)
```

```
 1                REPORTER'S TRANSCRIPT OF PROCEEDINGS

 2                         EUGENE, OREGON

 3                    WEDNESDAY, MAY 14, 2014

 4                         PAGES 1 - 55

 5

    COURT REPORTER:            Kristi L. Anderson
 6                             Official Federal Reporter
                               United States Courthouse
 7                             405 East Eighth Avenue
                               Eugene, Oregon 97401
 8                             (541) 431-4112
                               Kristi_Anderson@ord.uscourts.gov
 9

10  APPEARANCES OF COUNSEL:

11  FOR THE PLAINTIFFS DEANNA L. GEIGER, JANINE M. NELSON,
    ROBERT DUEHMIG, AND WILLIAM GRIESAR,
12
    Lake James H. Perriguey
13  Law Works, LLC
    1906 SW Madison Street
14  Portland, OR 97205-1718
    (503) 227-1928
15  Fax: (503) 334-2340
    Email: lake@law-works.com
16
    Lea Ann Easton
17  Dorsay & Easton LLP
    1 SW Columbia Street
18  Suite 440
    Portland, OR 97258
19  (503) 790-9060
    Fax: (503) 790-9068
20  Email: leaston@dorsayindianlaw.com

21

22

23

24

25
```

```
 1   FOR THE CONSOLIDATED PLAINTIFFS BASIC RIGHTS EDUCATION FUND,
     PAUL RUMMELL, BENJAMIN WEST, LISA CHICKADONZ, AND CHRISTINE
 2   TANNER:

 3   Jennifer J. Middleton
     Johnson, Johnson & Schaller
 4   975 Oak Street
     Suite 1050
 5   Eugene, OR 97401
     (541) 683-2506
 6   Fax: 541-484-0882
     Email: jmiddleton@jjlslaw.com
 7
     Kevin Diaz
 8   American Civil Liberties Union (ACLU)
     P.O. Box 40585
 9   Portland, OR 97240
     (503) 227-6928
10   Email: kdiaz@aclu-or.org

11   Misha A.D. Isaak
     Perkins Coie, LLP
12   1120 NW Couch Street
     10th Floor
13   Portland, OR 97209-4128
     (503) 727-2086
14   Fax: (503) 346-2086
     Email: MIsaak@perkinscoie.com
15
     Thomas R. Johnson
16   Perkins Coie, LLP
     1120 NW Couch Street
17   10th Floor
     Portland, OR 97209-4128
18   (503) 727-2176
     Fax: (503) 727-2222
19   Email: TRJohnson@perkinscoie.com

20

21   FOR THE DEFENDANTS JOHN KITZHABER, ELLEN ROSENBLUM, AND
     JENNIFER WOODWARD:
22
     Anna M. Joyce
23   Oregon Department of Justice
     1162 Court Street NE
24   Salem, OR 97301
     (503) 378-4402
25   Email: anna.joyce@doj.state.or.us
```

Sheila H. Potter
Oregon Department of Justice
Special Litigation Unit
1515 SW Fifth Avenue, Suite 410
Portland, OR 97201
(971) 673-1880
Fax: (971) 673-5000
Email: sheila.potter@doj.state.or.us


FOR THE DEFENDANT RANDY WALDRUFF:

Katharine von Ter Stegge (By phone)
Office of the Multnomah County Attorney
501 SE Hawthorne Blvd., Suite 500
Portland, OR 97214
(503) 988-3138
Fax: (503) 988-3377
Email: katevts@multco.us

Jenny M. Madkour
Office of the Multnomah County Attorney
501 SE Hawthorne Boulevard
Suite 500
Portland, OR 97214
(503) 988-3138
Fax: (503) 988-3377
Email: jenny.m.madkour@multco.us


FOR OREGON UNITED FOR MARRIAGE (AMICUS BRIEF):

Leonard J. Feldman (By phone)
Stoel Rives, LLP (Seattle)
600 University Street
Suite 3600
Seattle, WA 98101
(206) 624-0900
Fax: (206) 386-7500
Email: ljfeldman@stoel.com

1  FOR THE PROPOSED INTERVENOR DEFENDANT NATIONAL ORGANIZATION
   FOR MARRIAGE, INC.:
2
   John C. Eastman
3  Center for Constitutional Jurisprudence
   c/o Chapman University Fowler School of Law
4  One University Drive
   Orange, CA 90807
5  (877) 855-3330
   Fax: (714) 844-4817
6  Email: jeastman@chapman.edu

7  Roger K. Harris
   Harris Berne Christensen LLP
8  5000 S.W. Meadows Road
   Suite 400
9  Lake Oswego, OR 97035
   (503) 968-1475
10 Fax: (503) 968-2003
   Email: roger@hbclawyers.com

11

12                          GENERAL INDEX

13 Argument by Mr. Eastman          Pages 8, 22, 36, 40

14 Argument by Mr. Johnson          Pages 15, 32, 38

15 Argument by Ms. Potter           Pages 21, 35

16 Ruling                           Page 41

17

18

19

20

21

22

23

24

25

```
1                            PROCEEDINGS
2                     WEDNESDAY, MAY 14, 2014
3             THE COURT:  Please remain seated.
4             Thank you everyone.  Good morning.
5             Ms. Pew, if you'd like to call our case.
6             THE CLERK:  United States District Court for the
7      District of Oregon is now in session, the Honorable Michael
8      J. McShane presiding.
9             Now is the time set for Case 13-01834, Geiger, et
10     al. versus Kitzhaber, et al., oral argument.
11            THE COURT:  All right.  Thank you.
12            So I thought we could begin by having maybe each
13     of the attorneys for each group who is going to represent
14     their interests today introduce themselves.
15            I guess we can introduce everyone.  It takes more
16     time sometimes than the hearing itself.
17            So let's go ahead with the plaintiffs, if you'd
18     like to make your introductions.
19            MR. JOHNSON:  Your Honor, Tom Johnson for the
20     Rummell plaintiffs, and I will also be speaking today on
21     behalf of the Geiger plaintiffs.
22            THE COURT:  All right.  Thank you.
23            MR. JOHNSON:  We have -- I won't introduce all of
24     my -- our clients again.  We did that last time.
25            The only person who is not here today is
```

 1  Mr. Rummell, who is on a business trip.

 2          THE COURT:  Okay.  Thank you, Mr. Johnson.

 3          All right.  For the defense.

 4          MS. POTTER:  Sheila Potter for the Department of

 5  Oregon -- Justice -- excuse me; I am sorry -- the Oregon

 6  Department of Justice.

 7          I will be arguing on behalf of the state and the

 8  county defendants.

 9          THE COURT:  All right.  Thank you.

10          All right.  For the proposed intervenors.

11          MR. JOHNSON:  Judge McShane, John Eastman, and

12  with me Roger Harris on behalf of the intervenors National

13  Organization for Marriage.

14          THE COURT:  All right.  Thank you, Mr. Eastman.

15          So I have read the briefs, and what I don't want

16  to do is recite the briefs into the record.

17          I would like to keep the discussion focused on the

18  law and try to keep some of the hyperbolic statements in the

19  briefs to a minimum.  I know each side has very different,

20  strong views of the motion to intervene, but there are some

21  legal issues we need to resolve.

22          So I am going to pose some questions.  I am

23  probably going to pose more questions to Mr. Eastman because

24  the burden is on the National Organization for Marriage to

25  intervene.  But I will ask, then, the other parties if they

1    have particular comments on anything that Mr. Eastman says.

2         So Mr. Eastman, I will start with Chief Justice

3    Roberts' fairly blunt holding in *Hollingsworth*.

4         He states, "We have never before upheld the

5         standing of a private party to defend the

6         constitutionality of a state statute where state

7         officials have chosen not to.  We decline to do so

8         for the first time here."

9         So after that statement in *Hollingsworth*, is there

10   any law or cases that you can cite to where the federal

11   court has in fact allowed a private party to stand in for

12   the Executive Branch that is still good law?

13        MR. EASTMAN:  Well, Your Honor, I think that

14   mischaracterizes what *Hollingsworth* is about.  They were

15   specifically seeking to intervene on behalf of the state,

16   not representing their separate, particularized injuries.

17        And --

18        THE COURT:  But you continue to say in your

19   briefing that -- or maybe I am mixing it up with your

20   statements in the newspaper, and they are somewhat

21   overlapping, is that if they won't defend it, somebody has

22   to and it should be us.

23        MR. EASTMAN:  Well, that's right.  But seeking to

24   defend the statute because the party has particularized

25   injury is different than standing in the shoes of the

1    attorney general to defend it.  We are not claiming to

2    represent the state.  But the county clerk, and I think the

3    *Hollingsworth* case itself at a prior stage when the Imperial

4    County was denied intervention in that case, that was

5    because the county itself and the deputy county clerk didn't

6    have any independent obligation to enforce the law there.

7            "The county clerk," the court said, "may well

8        have, but that was not before us because the

9        county clerk did not seek to intervene."

10           We have a county clerk seeking to intervene.

11           THE COURT:  But not in any official capacity you

12   don't.

13           MR. EASTMAN:  Well, Your Honor --

14           THE COURT:  How do you distinguish *Karcher v. May*

15   on that issue?

16           MR. EASTMAN:  Well *Karcher v. May* involved -- I

17   actually think it's much closer to our case and it goes our

18   way.  *Karcher v. May* had two legislators who had no

19   authority under the state to intervene other than the state

20   Supreme Court had allowed them to intervene when the

21   attorney general wouldn't defend.

22           The Supreme Court of the United States rejected

23   their continuing intervention after they lost their offices,

24   but it was because they had no longer any particularized

25   injury.  They had particularized injury as long as they were

1    in those legislative positions.

2            Here, our county clerk continues to be in that

3    position, and he or she would -- you know, would be bound by

4    a ruling by this court, which the plaintiffs seek to have a

5    statewide injunction issued.

6            THE COURT:  Well, "Karcher and Orechio were

7        permitted" -- this is Justice Roberts -- "were

8        permitted to proceed only because they were state

9        officers acting in an official capacity.  As soon

10       as they lost that capacity, they lost standing."

11            MR. EASTMAN:  Well --

12            THE COURT:  So what I know about your clerk is it

13   is an individual in some county in Oregon who works as a

14   clerk.  They are not making an appearance in this case.  You

15   have avoided any attempt at having a dialogue with this

16   court about protective orders, about declarations under

17   seal.

18            You simply have made this statement:  We have

19   somebody who works as a clerk.  They have been injured

20   because they may have to, at some point, issue a license in

21   some county to a same-sex couple and they have a religious

22   objection to it.  A religious, personal objection.  I mean,

23   that was your most current declaration.

24            And by the way, I am not striking the recent

25   declaration that was filed.  I know there was a motion to

1    strike.  I forget who filed it.  But I am going to allow it.

2    I don't think it adds a whole lot other than a little bit

3    more information, which leads me to believe your clerk is a

4    moving target.  Every time somebody questions, well, who is

5    this clerk, we get another declaration giving us a little

6    bit more information.

7           But I am not hearing official capacity, any agency

8    relationship.  I mean, Roberts goes on and on about agency

9    relationship in *Hollingsworth*.  An agency relationship

10   between your clerk and their local government.

11          MR. EASTMAN:  Well, wait a minute.  The problem we

12   are -- the reason we are being vague, I think, is, I think,

13   well established in *NAACP v. Alabama* and a large number of

14   those cases.  There have been a number of cases where -- so

15   I want to unpack this to kind of get the discrete issues.

16          The first is NOM's third-party standing to

17   represent the interests of the clerk or the wedding provider

18   or the voters and then those particular interests.

19          So the reason we are not disclosing who the clerk

20   is is the same reason the doctors in *Griswold/Connecticut*

21   didn't disclose who their confidential married customers

22   were that wanted to seek contraceptive services or that

23   *NAACP v. Alabama* wouldn't disclose their members.

24          There are a whole host of cases from the Supreme

25   Court in that line of cases that specifically say when you

1   have got problems about exposing yourself, the

2   confidentiality that would be lost, the harassment that

3   might follow as a result of that, that's exactly the

4   situation that sets up the opportunity for the third-party

5   standing.  So that's why we have done that.

6        Now, the second piece of that, though, is does the

7   clerk, him or herself, have standing.  And if the clerk was

8   intervening on the clerk's own behalf, I think there would

9   clearly be standing.

10        And that's the prior round in *Perry* -- in the

11   *Perry* case doesn't address that because a clerk had not

12   moved to intervene in that case.  But the language of that

13   that we cite in our brief says that, you know, it may well

14   be different.  The clerk may well have standing because the

15   order is going to be applied to that clerk when it finally

16   comes down, when a statewide injunction issues.

17        So as an official of the state who is going to be

18   bound by that injunction, I think -- I think there would

19   clearly be standing.

20        So now the question is can that clerk, by being a

21   member of us with these concerns about harassment, in her

22   private capacity being a member, allow us to raise, on the

23   clerk's behalf, those claims.

24        And I think what we set out in our brief on this,

25   I think, is very important.  For example, if a clerk was

1   going to be forced to resign because could not do the job

2   after a decision from here made that job different than what

3   it had been when the clerk had first run for office, that

4   would be a personal harm as a result of the official duties.

5          THE COURT:  How would I ever know that?  How would

6   I ever know that that's a personal harm?  I mean, you

7   haven't even given us, even under seal, the name of the

8   county.  I mean, I imagine if we looked at the census data

9   for someplace like Lake County, for example, and that's --

10  not being from Oregon, Lake County is a fairly non-populace

11  county, a large one but not much population -- we may find

12  that in fact there are almost no gay families registered in

13  Lake County, and we might be able to at least use that

14  information to decide, you know, is this a hypothetical

15  harm, it is a real harm, or are Lake County officials

16  willing to make an accommodation for this particular

17  individual.

18         But the way you have formulated it to the court is

19  we have got a phantom back here, take my word for everything

20  that's going to happen to him.

21         MR. EASTMAN:  Well, two things.  First of all, I

22  think the *Southwest Center* says you have to take the well

23  pleaded facts as true in a motion to intervene.

24         THE COURT:  Not conclusory facts, though.

25         MR. EASTMAN:  Not conclusory facts, but --

1           THE COURT:  That's what I am faced with.

2           MR. EASTMAN:  Well --

3           THE COURT:  They are beyond inquiry.

4           MR. EASTMAN:  Well, let me propose this, then:

5           We could -- we could submit something under seal.

6     We could submit a declaration with the names and the county

7     redacted because I can't exactly identify the county without

8     identifying the county clerk, which, you know, is part of

9     the problem.  But I could submit a declaration from the

10    clerk.  I'd have to --

11          THE COURT:  I'd like a declaration from the county

12    official who is actually authorizing the clerk to intervene

13    in an official capacity.

14          MR. EASTMAN:  Well, as we represented in our reply

15    brief, the county clerk is independently elected, which

16    means that there doesn't have to be a specific

17    authorization.  There does have to be authorization if they

18    are going to expend county funds.  They are not, so -- which

19    is, you know, the other -- the purpose of the third-party

20    intervenor here.

21          THE COURT:  Okay.  Let me hear from the other

22    parties on -- we have kind of jumped off of my *Hollingsworth*

23    question into the issue of the substantial harm to the

24    clerk.

25          I will hear from the parties on that.

1          Mr. Johnson, do you want to go first?

2          MR. JOHNSON:  Yes, Your Honor.  What question

3   specifically?

4          THE COURT:  Let's talk about the substantial

5   interests of the clerk that's a member of the National

6   Organization for Marriage.

7          MR. JOHNSON:  Yes, Your Honor.

8          From a review of their reply brief, NOM's reply

9   brief, it seemed that they had all but conceded that this

10  person was not here in their official capacity.

11         It would have to be the office of the county that

12  was before the court.

13         What NOM is attempting to do here is really borrow

14  two levels of standing.  They are attempting to say we are

15  going to stand in the shoes of our member, and then we are

16  going to also, then, adopt their official capacity, the

17  office of that county.

18         And the kind of personal issue or personal

19  interest that they are trying to then assert through that is

20  a -- it's a personal issue.  It's really kind of a free

21  exercise issue.

22         And the office of the county, whatever county that

23  is, doesn't have a religion.  The office itself is secular.

24  And so they can't represent the county.  They can't adopt

25  that office.

1          The -- in terms of the -- if you look at that

2   personal interest, then, which is what you were talking

3   about -- actually, Your Honor, in front of the court in the

4   summary judgment briefing there is exactly the evidence that

5   you are talking about.  We submitted, I think it's -- it's

6   in the Misha Isaak declaration, Exhibit 8 or 9, all of

7   the -- all of the -- for the last seven years, six years,

8   all of the domestic partnerships that have been applied for

9   in all of the counties.

10          And there were, by my reading last night, seven or

11   eight counties that have never had a domestic partnership

12   applied for.  So it's completely speculative that this

13   person, a county official or not, would ever face this.

14          It's also completely speculative on just the

15   personal issue that this is actually a free exercise issue

16   under the *Smith* case, which is the peyote case, which

17   Ms. Easton spoke about at the last hearing.  There, the law

18   is that a generally applicable, religiously neutral law, you

19   can't have a free exercise claim there.

20          And we were looking at the research last night.

21   There are a number of states where gay marriage is now

22   legal, and in none of -- we could not find a single case in

23   any of those states where this free exercise right has been

24   recognized by any court.

25          THE COURT:  What do you mean by "free exercise

1  right"?  Sorry if I am not --

2          MR. JOHNSON:  So in that case, in the *Smith* case,

3  you -- there was -- a person working for the state had a

4  drug test, and they came up positive on peyote.  And they

5  said, well, it's my religious right to -- I have to smoke

6  peyote.  And the court said, Justice Scalia, and that was

7  what -- remember the feedback at the last hearing,

8  Ms. Easton -- Justice Scalia wrote that opinion, finding

9  that there was no free exercise right here.

10          Here, the generally -- the neutral law would be

11  that anyone who walks in the door of this county has to

12  get -- you know, any two people would have to get married.

13  So it's neutral -- it's a neutral law, no religious specific

14  there.

15          And then there's also a question in terms of the

16  speculative nature of the claim that there's -- we don't

17  have any evidence that -- with this particular county that

18  accommodations could not be made for this clerk.  That --

19  that somebody else could do the stapling or the filing of

20  the forms.  The *Lee v. State* case is quite clear, Your

21  Honor, that in this state, marriage is really a state

22  function.  And what happened in that state -- and we can

23  talk about the *Perry v. Schwarzenegger* case, but we are

24  talking about Oregon law here.

25          What happened in *Lee v. State* was the lawsuit was

1    filed.  Then Measure 36 came.  And then the Supreme Court

2    said, okay.  Well, that's -- Measure 36 is not a violation

3    of the state constitution, the privileges and immunities

4    clause.

5            And Multnomah County said, not so fast.  We have

6    issued 3,000 marriages.  And so all of those marriages came

7    before Measure 36 came.  So they are all valid.

8            And what the Supreme Court of Oregon said was no.

9    That's -- the state is the -- is the arbiter of marriage in

10   Oregon.

11           THE COURT:  So why did you file against the

12   Multnomah County equivalent of a -- of a clerk, especially

13   when, in some of the cases I have read, one of the first

14   arguments is why the clerk should be thrown out of the case.

15   I forget which cases those are now, and I am sorry.  You

16   might have to remind me.  But there are some cases that have

17   been decided on marriage where one of the holdings is that

18   in fact the county clerk has no standing and should not have

19   been named as a party.

20           So why did you do this?

21           MR. JOHNSON:  Your Honor, I imagined that you

22   might ask that question.

23           So we filed our lawsuit against the State of

24   Oregon and the office of Multnomah County and the county

25   assessor, the office, the official capacity, in order to

have, in an abundance of caution, in light of *Lee v. State*,
to have a county, in that office, in front of the court for
purposes of the order that we would hope would be issued.

But we knew --

THE COURT:  Well, then why not other counties and
other clerks who are going to be subject to the same order?

MR. JOHNSON:  Exactly.  Exactly, Your Honor.

And we knew at the time, and I realize that the
county is here, but please don't tell them, Your Honor, but
we knew that we might be susceptible to a motion to dismiss
under *Lee v. State*.

But importantly, Randy Waldruff is the person that
holds that position who is the county assessor, and we named
that office and named him because he holds that office.  If
it's tomorrow some other person, we would have put their
name in the caption and not his name.

But we don't care, for purposes of the relief that
we are requesting here, what his personal -- it's not
germane to any of the issues that we have or the relief that
we are requesting in the order what his personal views -- no
disrespect to Mr. Waldruff, but we don't care, for purposes
of this lawsuit, what his personal views are about same-sex
marriage.

THE COURT:  The argument is that somebody's
personal views, when it comes to religion, can be a

1    significant harm, can't it?

2            MR. JOHNSON:  It could be, but not in this context

3    Your Honor.  *Perry v. Hollingsworth* -- or *Hollingsworth v.*

4    *Perry* is very clear.  As you said, the final -- the sentence

5    before the last paragraph said that we have never recognized

6    having a private party come in to intervene to defend the

7    state constitutionality or state statute, and that's what's

8    happening here.

9            So in terms of those personal vows, although they

10   may be very important to someone, they are not -- you can't

11   come in as a -- as -- effectively as the attorney general

12   and defend the constitutionality, and that's what's

13   happening here.  And they are just doing it based on those

14   personal views.

15           I want to -- I know you referenced that -- the

16   hyperbole at the outset, and I don't want to dwell on that.

17   And I am completely confident that all of the lawyers in

18   this case are acting in good faith, Your Honor, but I

19   need -- I wanted to address just very quickly the -- in

20   NOM's brief there was reference to "collusion" a number of

21   times.

22           THE COURT:  You know, I don't want to discuss

23   that.

24           MR. JOHNSON:  Okay.

25           THE COURT:  I think it was a poorly -- very

| | |
|---|---|
| 1 | poorly -- word choice.  It suggests unprofessionalism, and |
| 2 | I -- it does make me question about, in terms of |
| 3 | discretionary intervention, whether I want to go down a road |
| 4 | where people are accusing each other of unprofessional |
| 5 | conduct when this court has seen none.  So I don't want a |
| 6 | conversation on it. |
| 7 |        MR. JOHNSON:  Okay. |
| 8 |        THE COURT:  So I want to hear from Ms. Potter on |
| 9 | this issue if she wants to weigh in on the issue of the |
| 10 | clerk. |
| 11 |        MS. POTTER:  Thank you, Your Honor.  I won't |
| 12 | repeat -- I think Mr. Johnson made some good points.  I |
| 13 | won't repeat those. |
| 14 |        I think it's important here that the expressed |
| 15 | substantial legal interest is not that the clerk would be |
| 16 | unable to carry out his or her official duties.  It is that |
| 17 | if this court were to enter an order, then events might |
| 18 | develop such that at some point down the line, the clerk |
| 19 | would find himself in a position, or herself, in which he or |
| 20 | she -- I am sorry -- in which he or she does not want to |
| 21 | carry out part of his or her duties and does not want to |
| 22 | delegate any of those duties to someone else. |
| 23 |       And I don't find any support in any case law for |
| 24 | the proposition that just having a personal preference not |
| 25 | to want to do part of your job is a substantial legal |

1    interest such that it would support an intervention here.

2          I think it also really raises some troubling

3    interests with respect to transparency because if this --

4    this person can only come in as an official of this county,

5    as an elected official of this county, as Mr. Eastman has

6    represented, and is seeking to hide an act that he is

7    attempting to take as an official of this county from the

8    people who will be called upon to vote for him or her in the

9    next election, if there is an official interest of this

10   county official in appearing in this case to argue for his

11   or her interests, it should be done in his or her official

12   capacity and not through a nongovernmental interest group

13   that he or she is a member of just personally.

14          THE COURT:  Okay.  Mr. Eastman, you have the

15   burden, so I will give you the kind of final reply on these

16   comments.

17          MR. EASTMAN:  So I want to give a parallel

18   hypothetical.  Suppose we had a public hospital with a nurse

19   who had a strong moral objection to performing abortions and

20   there was a case challenging a state statute dealing with

21   abortion that said they don't have to be performed in the

22   public hospitals, and it was challenging that as a violation

23   of -- unconstitutional.

24          And the relief sought was that every public

25   employee in that hospital would be obligated to perform

1  these abortions.  The nurse doesn't want to make an

2  appearance on her own behalf, but she is part of an

3  organization that opposes abortion.

4        The fact that there was a personal interest but

5  that it is affected by her public duties that are going to

6  be directly affected by that litigation I think is

7  sufficient to give her standing and, hence, the third party

8  standing for the organization of which she is a member.

9        And here's what the Oregon Supreme Court said in

10  *Lee*:

11        "The ministerial aspects of issuing marriage

12        licenses in Oregon have, by statute, long been a

13        county function."

14        And then it goes on to list the litany of duties

15  that the county clerk has in the issuance of marriage

16  licenses.

17        The plaintiffs here have sought a statewide

18  injunction through the named state defendants that will

19  reach to every county clerk.  So the county clerk, in the

20  performance of those duties, is clearly going to be bound by

21  this injunction if this court grants the relief they have

22  requested.  And it will implicate interests of hers or his

23  that are involved because the job that that person took when

24  they ran for that office will now be dramatically different

25  as a result of this court's ruling and the injunction that

1   plaintiffs have sought than it would have been otherwise.

2           The standard for intervention is a very minimal

3   one.  That's a protectable interest, and it's a

4   particularized injury.  It's not the kind of generalized

5   injury that the Chief Justice Roberts was talking about in

6   *Hollingsworth*.

7           THE COURT:  But it's a significant protectable

8   interest relating to the property or the transaction that is

9   the subject of this action.

10          In your hypothetical, the transaction is an

11  abortion and the nurse would be part of that transaction if

12  they were required to participate.

13          Here, the transaction is the conferral of rights

14  of marriage.  It's not handing out a certificate in an

15  office.  It's the marriage that -- I mean, marriage and

16  going to a clerk's office to get paperwork are two different

17  things.  I don't -- I mean, they have to file something, I

18  suppose, but you can file it in any county.

19          MR. EASTMAN:  Then the relief that the plaintiffs

20  have sought is not relevant to their case.  They have sought

21  an injunction that would require every county clerk to issue

22  those licenses.  It's this county clerk that will be

23  obligated to perform that duty in response to such an

24  injunction.

25          THE COURT:  Okay.  All right.  In the -- again, I

1    turn to Roberts in the *Hollingsworth* case where he continues

2    to talk about what I think really is a separation of powers

3    issue, and what you are asking the court to do is say

4    because there are members of your organization that disagree

5    with the Executive Branch's interpretation of the law and

6    failure to defend the law in this case, that a private

7    organization without any agency relationship to the

8    government will stand in.

9            And I mean, it would be me telling Ms. Rosenblum,

10   who is right next to you, Ms. Rosenblum, I am going to

11   replace the Executive Branch with an agency that doesn't

12   answer to you.

13           And what Roberts said is:  "Yet petitioners

14       answer to no one; they decide for themselves, with

15       no review, what arguments to make and how to make

16       them.  Unlike California's attorney general, they

17       are not elected at regular intervals or elected at

18       all.  No provision provides for their removal.  As

19       one amicus explains, the proponents apparently

20       have an unelected appointment for an unspecified

21       period of time as defenders of the initiative,

22       however and to whatever extent they choose to

23       defend it."

24           And isn't he really saying that the Judicial

25   Branch should not get involved in who and how the Executive

1    Branch is going to make these decisions?

2            MR. EASTMAN:  No.  The difference, Your Honor,

3    with all due respect, is Chief Justice Roberts begins that

4    discussion by focusing on the fact that the proponent in

5    that initiative, after the initiative had passed, no longer

6    had any particularized injury.

7            And so all they were doing was objecting in a

8    generalized way to the lack of defense that was being

9    provided by the attorney general.

10           They -- because they had no particularized injury,

11   that whole discussion, I think, doesn't deal with the

12   question where we now have alleged specific, particularized

13   injuries.

14           And Your Honor asked earlier if I had any case

15   where people have been allowed to intervene when the

16   government itself was not adequately or fully defending;

17   nothing since Chief Justice Roberts' opinion because that

18   was relatively recently.  But there are a whole slew of

19   cases in the environmental context, for example --

20           THE COURT:  That's legislatively created.

21           MR. EASTMAN:  Well, it's legislatively created,

22   but --

23           THE COURT:  That's where the separation of powers

24   issues come in.  There are tons of cases where the

25   legislature says citizen lawsuits, the consumer protection,

1    the environmental law, the law creates citizen lawsuits.

2            But when does the Judicial Branch create them?

3    And I don't -- I mean, the question is I don't know if the

4    Judicial Branch has the authority to create --

5            MR. EASTMAN:  Given the duties that the law in

6    Oregon bestows on county clerks, I think the law does create

7    such an interest of particularized injury here.

8            And the statutes could not create standing if it

9    did not meet constitutional grounds.  The Supreme Court's

10   been very clear on that.

11           So what the statutes have authorized has to be

12   permitted under the Constitution.  What we are saying here

13   is that the particularized injury for the county clerk and

14   for others who have particularized injuries that are going

15   to flow from a change in the law in this state, you know,

16   that that gives them enough standing to be able to intervene

17   to at least be able to raise some objection.

18           And Your Honor, you mentioned earlier on the

19   question of discretion.  One of the -- the only issue where

20   there's great discretion is on the timeliness question.  But

21   I do think, as part of the discretionary judgment, the fact

22   that the parties are both -- all taking the same side of the

23   case, seeking the same relief, makes this, by definition --

24   and it was not meant as a claim that there's any

25   unprofessional conduct, but by definition, "collusion" is

1  when you take the same side of the case and you are

2  admitting things that --

3          THE COURT:  That's not the definition of

4  "collusion."  Don't -- let's have honor, Mr. Eastman.  You

5  chose "collusion" because it would suggest that the parties

6  have gotten together; not that they just happened to agree

7  on a legal topic.  I mean, that's the import of that word.

8          MR. EASTMAN:  There's a middle point, Your Honor,

9  on it.

10          THE COURT:  You should have chosen a different

11  word.

12          MR. EASTMAN:  The middle point --

13          THE COURT:  You should have chosen a different

14  word.  I don't want to hear about a middle point.  It was a

15  bad choice of words.  It suggested unprofessionalism.

16          MR. EASTMAN:  When somebody makes a concession on

17  factual claims or on legal claims that are not warranted in

18  the law, you have a problem with both parties not being

19  adversarial in the case.

20          THE COURT:  Okay.

21          MR. EASTMAN:  All right?  And --

22          THE COURT:  That was the argument that Thomas made

23  in his dissent.

24          MR. EASTMAN:  Well, but, again, the issue there

25  was whether they had -- the California Supreme Court had

1    said they have standing because they represent the interests

2    of the state.  Right?  They did not make the point on

3    whether they had a particularized injury, which is what we

4    are making.  The particularized injury line of cases is

5    entirely different on the agency cases.

6           And what Chief Justice Roberts is talking about in

7    *Hollingsworth* is an agency case.  They didn't make the --

8    they did make the claim in their brief, but that was not

9    what Chief Justice Roberts was talking about.  They claimed

10   that they had a particularized injury that they didn't.

11   Chief Justice Roberts said all you are claiming here is a

12   generalized injury.  I think we have got three different

13   reasons why we have particularized injury.  The county clerk

14   was one, but I think the others are important as well.

15          THE COURT:  How is the voter any different than

16   the backers of the initiative in the *Hollingsworth* case?

17          MR. EASTMAN:  They didn't make a vote dilution

18   claim.  And I think the argument here is -- again, maybe

19   it's my law professor background, but let me make a

20   hypothetical.  Let's suppose in a -- a city in Alabama an

21   African-American majority, temporary majority decides to

22   change their electoral system from an at-wide -- a

23   district-wide -- a citywide to a district election system.

24          The city attorney doesn't like that move.  And so

25   somebody sues, alleging that the effort to make that change

Case 6:13-cv-01834-MC   Document 115   Filed 05/15/14   Page 30 of 55

30

1   in the law was designed for the explicit purpose of

2   benefiting a particular race.  And the city attorney

3   concedes that point in the answer to the complaint.  That

4   then sets up a summary judgment motion that completely

5   negates the effect of that citywide election.

6            That would be a vote negation case, and every

7   African-American who voted in favor of that thing could have

8   a vote dilution claim, even though their interests are

9   generalized to that extent.

10           There's nothing in the Supreme Court's decision in

11  *Hollingsworth* that throws out that entire history of vote

12  dilution cases.  But every one of them is, in that sense,

13  generalized.  But because of the importance of the right to

14  vote and not have it taken away, either by blocking you on

15  the front end from casting it or negating its effect on the

16  back end by conduct that effectively negates it, that you

17  have those claims.

18           And that's why I think the voters here have a

19  particularized injury as recognized from those cases all the

20  way back to *Reynolds v. Sims* on those vote dilution cases.

21  Every one of those involved a generalized injury, not a

22  particularized one in the way we normally talk about

23  particularized in standing, and yet the Supreme Court has

24  routinely recognized standing in those cases.

25           THE COURT:  Okay.  Ms. Potter, do you want to

1    respond to that?

2              MS. POTTER:  Yes, Your Honor.  Thank you.

3              Just on -- in the immediate sense, of course, the

4    votes weren't diluted.  People who voted for Measure 36 had

5    their votes counted.  Measure 36 became law.  It is law.

6    It's being enforced right now today.

7              There's no basis to say that any of their votes

8    were diluted, and the hypothetical is just not comparable to

9    what happened here.

10             The other thing is that the injury that

11   Mr. Eastman is discussing is not the injury that is -- that

12   is relevant to the subject of this lawsuit.  What he is

13   articulating is an injury that he believes were done to the

14   voters by the attorney general engaging in an independent

15   analysis of the law and articulating the legal position that

16   she determined was the correct one on the basis of federal

17   and Oregon law.

18             That's not the subject of this lawsuit.  The

19   injury appears to be this -- the fact that the plaintiffs

20   and the attorney general reached the same legal conclusion

21   on the legal question that is the subject of this lawsuit.

22   There isn't an injury to the voters on the subject of this

23   lawsuit, which is a question of whether the plaintiffs'

24   civil rights are being violated by Oregon law.

25             THE COURT:  Hard one to explain to voters, but all

1    right.

2           Mr. Johnson, any comment on that?  You don't need

3    to if you don't have anything to add.

4           MR. JOHNSON:  Your Honor, the only other point I

5    would like to make is that in terms of trying to minimize

6    the Supreme Court's holding in *Hollingsworth v. Perry* and

7    say that the court was not considering people in their --

8    the individual views that voters might have or the

9    individual views that a person might have in its holding,

10   the court cited -- you mentioned the *Karcher* case, but the

11   court also, in its reasoning and in its opinion, cited the

12   *Diamond v. Charles* case.

13          And in that case, there was a particular person.

14   There was a criminal statute outlawing abortion that a

15   number of OB/GYN's came to challenge, and the state declined

16   to defend that law.  And a conscientious objector to

17   abortion, somebody who had value interests consistent with

18   that statute, similar to the views that people would say,

19   consistent with Measure 36, attempted to intervene.  And

20   what the court said was -- and that person also indicated

21   that they had a -- an economic interest consistent with the

22   law because they said, well, I am a pediatrician and if

23   there are fewer abortions, then there will be more patients.

24   So they had both an economic interest that they were putting

25   forth and this kind of value interest.

1          And the court dismissed that and said you can't

2     come in and represent the side of the state when the state

3     chooses not to enforce this law in the way that you would

4     want it enforced.

5          And the court and Justice Roberts in *Hollingsworth*

6     *v. Perry* talked about that case.  That case is inherent in

7     the court's ruling.

8          THE COURT:  Okay.  I'd ask you to respond to this

9     statement:

10          "A prime purpose of justiciability is to

11          ensure vigorous advocacy, yet the court insists

12          upon litigation conducted by state officials whose

13          preference is to lose the case."

14          And granted, that is in Justice Thomas's dissent,

15     but it does certainly reference what the intervenors are

16     claiming, and that is advocacy is something that should

17     be -- that improves the system and improves decision making

18     as opposed to hinders it.

19          What are your thoughts on that?

20          MR. JOHNSON:  I think I will answer that -- I am

21     not going to be too roundabout, but I will give a little bit

22     of a history lesson here in terms of this case.

23          So when we came into this case, the *Rummell*

24     plaintiffs, we were a couple months behind the *Geiger*

25     plaintiffs, and we brought our case knowing that -- that

1      there was an answer in the *Geiger* case already, and that

2      answer attached the memo from then Deputy Attorney General

3      Mary Williams to Michael Jordan; not that Michael Jordan.

4              And the -- so we were -- it was clear to us at

5      that point when we came into this lawsuit that this case

6      would be potentially a bit different from other cases where

7      I have been on the other side of the DOJ.  And so we knew

8      that.  That was obvious.  That was in the court record.

9              And we had the hearing for the consolidation here

10     in January.  And then after that, we inserted -- the court

11     asked for a scheduling order, and we inserted into that

12     scheduling order for the court's consideration an amicus

13     date because we did the research at that time.  We looked at

14     *Hollingsworth v. Perry.*  We looked at these issues and said,

15     okay, we are going to have a situation here where the court

16     might be confronted with a situation where the state may not

17     assert certain interests in the way that some people would

18     want those interests to be asserted.  So let's propose to

19     the court that there be an amicus date.  And that amicus

20     date came and went.

21             But the thought was that yes, Your Honor, that

22     this is, we recognize, a bit of a different experience in

23     terms of the fact that the state is not defending the law in

24     the same way that some organizations out there might want it

25     to be defended, but that doesn't change the law in terms of

1    whether or not they have a right to intervene here.

2              THE COURT:  Okay.  Ms. Potter, anything on that

3    issue?

4              MS. POTTER:  Yes, Your Honor.  Not only -- the

5    state has advised if the court wants to hear the -- the

6    state has certainly laid out arguments that have been made

7    in other cases around the country.  The court has available

8    all those cases, the briefings by defendants that are

9    defending their state bans vigorously.  We have attempted to

10   assist the court in its decision by laying out those

11   arguments and responding to them.  So the court has that

12   opportunity.

13             We also, if the court wishes to receive briefing

14   from NOM on the legal questions that are part of this, not

15   as a party but as an amicus, simply to make those arguments

16   with a level of vigor and conviction that the state is not

17   presenting because we analyzed them and determined that

18   those were not a basis to uphold the law, we don't have an

19   objection to the court deciding that it would like to

20   receive a late-filed amicus brief in which NOM can make all

21   of the arguments that it wants the court to consider.

22             And I think it really gets -- this gets to the

23   distinction between advocacy and being an adversary, and NOM

24   has suggested that it wants to play an adversarial role.

25   And the problem is it is not an adversary to the plaintiffs

1    here nor are its members because nothing that this court

2    could order NOM to do would have any effect on the relief

3    that the plaintiffs are actually seeking.

4              So legally NOM isn't an adversary.  The parties

5    who are in a position to be ordered to do something and to

6    defend the state law are in the case already.  That's the

7    adversarial role.  The advocacy can be handled by an amicus

8    brief if the court wants to accept a late-filed brief.  We

9    don't have an objection to that.

10             THE COURT:  Okay.

11             MR. EASTMAN:  Your Honor, can I address that

12   point?

13             THE COURT:  Yes.  And I think, Mr. Eastman, I am

14   probably -- those are really the heart of my questions.  So

15   if you want to make a general statement, if you want to

16   respond and anything else outside of your briefs you want me

17   to consider, now would be the time to convince me.

18             MR. EASTMAN:  You know, on this both parties have

19   said repeatedly that the state defendants are enforcing the

20   law, and that, under *Windsor*, was enough to create the

21   necessary adversarialness for jurisdiction according to

22   Justice Kennedy's opinion.  But that's not accurate.  They

23   are only enforcing half of the law.  With respect to at

24   least two of the plaintiffs, those who were married out in

25   Canada and are seeking to have the marriage recognized, the

1    day after the lawsuit was filed, the attorney general said,

2    we are not going to enforce that, and they have actually now

3    adopted regulations in this state not enforcing that part of

4    the law.

5            So at least on that part of it, there is not only

6    not a defense of the law but not an enforcement of the law

7    either.  And I do think that creates a real problem for

8    adversarialness, even under Justice Kennedy's *Windsor*

9    opinion.

10           There's an easy way out of that, according to

11   *Wright* [sic] and *Miller*.  The easy qualification is that a

12   case where the parties desire the same result may be saved

13   by intervention of a genuine adversary who represents the

14   rights that otherwise might be adversely affected.

15           So if we have rights of a county clerk who are

16   adversely affected or voters on a vote dilution claim or

17   wedding providers who are going to have a different legal

18   regime that they have to operate under as a result of a

19   statewide injunction, if it issues as the plaintiffs have

20   requested, those are rights that might be adversely

21   affected.  Any one of them could intervene on their own

22   name.  We believe that there's clear authority for us as an

23   organization to intervene on their behalf given the hurdles

24   to them intervening themselves.

25           THE COURT:  Okay.

```
 1              Anything else outside your briefs?

 2              MR. EASTMAN:  No, Your Honor.

 3              THE COURT:  Anything from the other parties you

 4    want me to consider outside your briefing?

 5              MR. JOHNSON:  Your Honor, could I talk about the

 6    timeliness issue for a moment?

 7              THE COURT:  You can if there's something new.  I

 8    think I have -- and I have put together a list here in my

 9    notes of findings with regard to the timing.

10              MR. JOHNSON:  The only thing I wanted to add is

11    that one of the factors in timeliness is, obviously, in the

12    complete discretion of the district court.

13              THE COURT:  Yes.

14              MR. JOHNSON:  On timeliness, one of the factors

15    for timeliness -- there's three prongs:  The stage of the

16    proceedings, the reason for the delay, and the prejudice.

17              On the stage of the proceedings, we made the

18    point, I am not going to make it again, about 38 hours

19    before the motion for summary judgment was heard and all of

20    that.  And then the cases on both sides were, frankly, not

21    applicable.  You know, it's really the question of the stage

22    of the proceedings in this case.

23              And I am sure that we all -- all the lawyers and

24    Your Honor have been involved in cases that went on for much

25    longer and involved many depositions and that kind of thing.
```

1    That's not this case.

2           But if the court were to look to see, okay, well,

3    what kinds of cases could I compare this to to determine the

4    stage of the proceedings, we would urge Your Honor to look

5    at all of the cases that have been filed post-*Windsor*.  And

6    if you look at those cases, and now I think 13 have been

7    decided, all in the direction that we are seeking here, Your

8    Honor, but if you look at those cases, there are a number of

9    them that have been decided in less time or around the same

10   time as right now here in this case.

11          So in terms of the stage of the proceedings, we

12   believe that they are late; that the *Bostic v. Rainey* case

13   in Virginia was brought in July and decided in February.

14   The *Love* [sic] *v. Beshear* case was brought in July and

15   decided in February.  The *Lee v. Orr* case in Illinois was

16   brought in December and decided in February.  That's three

17   months.  The *De Leon* --

18          THE COURT:  Which case was that?  I am sorry.

19          MR. JOHNSON:  The *Lee v. Orr* case in Illinois was

20   brought in December and decided February, three months.  The

21   *De Leon v. Perry* case in Texas was brought in October and

22   decided in February, four months.  And just yesterday, the

23   Idaho District Court struck down that state's gay marriage

24   ban.  That case was brought in November and decided

25   yesterday.  The motion for summary judgment in that case was

1    filed on February 18th, the same day we filed our motion.

2         THE COURT:  Okay.  Timing, Mr. Eastman, if you

3    want to?

4         MR. EASTMAN:  The one thing not in our brief on

5    this point is the statement by the ACLU's executive

6    director, counsel for the plaintiffs here, back on

7    January 25th.  "I think it's a little early to characterize

8    the state's defense of Measure 36."  This is in one of the

9    exhibits attached to one of the declarations.

10        "I think we will not have a clear picture until

11   the state responds to our own motions for summary judgment."

12        I think that's true.

13        And what happened since then, we learned that what

14   those legal arguments were or, rather, what was being

15   abandoned, we learned that there was not going to be an

16   appeal taken.

17        And quite frankly, NOM did not have standing on

18   its own to intervene until it became clear that it had

19   members who had this *NAACP v. Alabama* hurdle to intervening,

20   themselves.  That did not happen overnight, but we were

21   diligent in trying to pull that together.

22        THE COURT:  Okay.  All right.  I am going to take

23   a brief recess, maybe five minutes, and go over my notes.  I

24   think I am prepared to issue a ruling on intervention.  So I

25   am going to take a -- let's take a five-minute recess.

1              *(Recess.)*

2              THE COURT:  I did want to address a filing, the

3    notice of request for information regarding recusal that was

4    filed by the proposed intervenor.

5              I had a little hard time understanding what was

6    being asked.  I think there's a misunderstanding in the

7    notice of both the facts and the law in the case, and I may

8    have contributed some to misunderstanding of the facts back

9    on January 22nd.

10             So I want to clarify that I have never made a

11   finding under Section -- it would be 455(a) for recusal that

12   would warrant a waiver by the parties to the case.  A

13   finding hasn't been made.

14             You know, there's quite a -- I don't think there's

15   a legal basis for a nonparty, or maybe even a party, to

16   discovery of a judge on an issue of recusal, but I did open

17   my mouth up on January 22nd, so I don't have any problem

18   explaining some of this to you because it was raised.

19             So let me kind of clarify some of the issues that

20   were raised in the notice.  And I want to begin by -- I

21   think I said this on January 22nd.  On the issue of gay

22   marriage, I have never attended a rally.  I have never made

23   a public statement.  I cannot recall having donated money to

24   an advocacy group that supports gay marriage.

25             Despite being gay and involved in the law, the

subject of gay marriage has held little legal or personal interest to me.  Until I was assigned to this case, I had not read the entirety of the *Windsor* decision.  I had read the dissent, and I had read none of the *Hollingsworth* opinion.  And I know of no personal or financial benefit I would receive that is dependent on the outcome of this case.

What I think I tried to discuss on January 22nd was that I do try my best, in a small community, which is generally Oregon, to avoid political discussions on matters that could come before me.  There are times when comments are made, but inadvertent comments of others are not the basis upon which impartiality can reasonably be questioned.

So to give examples on an issue of same-sex marriage and where it probably comes up the most where I am subject to comments, it has actually been the times I attend Mass in recent years it has become very common for a priest to read political statements from the bishop or archbishop to the congregation condemning efforts to legalize gay marriage.

Another example that I raised at the January 22nd hearing was a CLE I attended at the law school.  And I raised it because I believe it's Ms. Middleton was one of the speakers.  I didn't know Ms. Middleton.  I was just moved to Eugene when my clerks and I attended the CLE.  It was approved for credit by the Oregon State Bar.  It was

1  sponsored by the Oregon School of Law -- or University of

2  Oregon School of Law, OGALLA, and, I believe, the ACLU.

3          And generally, it was a lecture on the history of

4  *Windsor*, the holding, and the difficulty that practitioners

5  face trying to advise clients.

6          At the very end, and this is where I said what

7  made me nervous is I don't like to be campaigned.  And at

8  the very end, somebody from an organization in favor of a

9  ballot initiative redefining marriage spoke, asking people

10  to volunteer to stay and sign up.  My clerks and I left

11  because we did not want to become part of a political

12  campaign.

13          And I guess those are the kind of events that I am

14  talking about that if people were aware of and they had

15  questions about I was willing to share them.

16          The other issue that's been addressed both by the

17  notice and repeatedly with the media is the fact that I

18  share characteristics with, I guess, at least the male

19  plaintiffs in this case in that I am gay and raising a

20  child.  It's true.  I guess we do share characteristics.  To

21  anyone under the age of 35, I think they would say that

22  Mr. Eastman and I share more personal characteristics.  So,

23  you know, we are white, we are male, we are exactly the same

24  age, I believe, or close to it.  I think we are both --

25  well, I am 53.  We have worked our whole life in the law.

1    We have both been advocates.  We have both -- you know, as a

2    public defender, I know what it's like to sometimes take on

3    issues in an unpopular, sometimes, setting.

4            But the fact that the plaintiffs share

5    characteristics with me, gay men appear in front of me all

6    the time, sometimes with their families, throughout the

7    years on criminal cases, on family law cases, on civil

8    cases.  I have sent people with very similar characteristics

9    of me to prison, and I haven't given a thought to the fact

10   that we have common characteristics.

11           So to me, in this case it's irrelevant.  Certainly

12   if the posture of the case changed, I would certainly -- I

13   certainly understand my ongoing duty as a judge to be aware

14   of any possible conflict.

15           So I did want to address that because it was

16   raised by notice.

17           With regard to intervention, I am not going to

18   leave you all hanging with a big surprise.  I am going to

19   deny intervention, and here is my, just, bench opinion:

20           Federal Rule of Civil Procedure 24 allows the

21   court, in certain circumstances, to permit intervention of a

22   nonparty in ongoing litigation.  Intervention can be of

23   right or by permission of the court.  The burden is on the

24   proposed intervenor to demonstrate that it meets the

25   requirement under rule.

1          The Ninth Circuit has held that, in determining

2   whether intervention is appropriate, the court should be

3   guided by practical and equitable considerations.

4          The parties seeking intervention by right must

5   make a four-part showing under Rule 24(a).  Of the four, I

6   am going to focus on the first two prongs:  Whether the

7   application is timely and whether the proposed intervenor

8   has a significant protectable interest relating to the

9   property or the transaction that is the subject of this

10  action.

11         Intervention under Rule 24(b) is discretionary

12  with this court.  Nonetheless, to allow for consideration of

13  the court, the proposed intervenor must satisfy a

14  three-prong showing that the motion is timely; that it has

15  an independent grounds for federal jurisdiction; its claim

16  or defense and the main action share a common question of

17  law or fact.

18         So the threshold question is timeliness, and the

19  court makes the following findings:

20         The *Geiger* plaintiffs, Geiger, Nelson, Duehmig,

21  and Greisar -- Greisar?  Greesar?  Greisar?

22         MR. PERRIGUEY:  Greisar.

23         THE COURT:  Greisar.  Thank you.  Sorry.

24         Brought this action on October 15th, 2013,

25  challenging the definition of marriage found in the Oregon

 1    Constitution and the Oregon statutes.

 2            The *Rummell* plaintiffs, which include Rummell,

 3    West, Chickadonz --

 4            MR. ISAAK:  Chickadonz.

 5            MR. JOHNSON:  Chickadonz.

 6            THE COURT:  Chickadonz and Tanner filed their

 7    action on December 19th, 2013.  Their challenges were

 8    identical to the *Geiger* plaintiffs.

 9            The court consolidated the cases on January 22nd,

10    2014.  At the same time, the parties agreed that this matter

11    would be submitted to the court for dispositive ruling on

12    summary judgment.  The dispositive motion hearing was set

13    for April 23rd, 2014.

14            And that was -- and I agree.  That was going to

15    be, under this -- the case posture, the dispositive, final

16    hearing on the matter and only hearing on the matter.

17            The plaintiffs filed their motions for summary

18    judgment on February 18th, 2014.  That's the *Geiger*

19    plaintiffs.  The *Rummell* plaintiffs filed their motions for

20    summary judgment on March 4th, 2014.

21            Prior to this case ever being filed, Attorney

22    General Rosenblum, in an amicus brief to the Ninth Circuit,

23    took a clear position that, quote, The exclusion of same-sex

24    couples from marriage is unconstitutional.  This occurred in

25    October of 2013.

1        On February 20th, 2014, having just filed their

2   answer to the *Rummell* complaint, Attorney General Rosenblum

3   announced publicly that the state would not be defending the

4   Oregon marriage laws based on their interpretation of recent

5   appellate decisions.

6        That same day, the proposed intervenor, the

7   National Organization for Marriage, announced that, quote,

8   Attorney General Rosenblum is shamefully abandoning her

9   constitutional duty, closed quote.

10        As early as January 25th, 2014, counsel for

11   proposed intervenor was calling for the Oregon governor and

12   the attorney general to uphold their oath of office and

13   defend the Constitution of Oregon.

14        Defendants Kitzhaber, Rosenblum, and Woodward

15   filed their response to summary judgment motions on

16   March 18th, 2014.  In their response, the defendants took

17   the position that plaintiffs' motion for summary judgment

18   should be granted because the defendants believed that

19   Oregon's marriage laws restricting marriage to one man and

20   one woman could no longer pass scrutiny under the federal

21   constitutional analysis put forth in recent appellate

22   decisions.

23        By April 1st, 2014, this court had received amicus

24   briefs from three citizen groups.

25        On April 21st, 2014, so just two days prior to our

dispositive motion hearing, counsel for the proposed

intervenor conferred with plaintiffs' counsel regarding

intervention and delaying the April 23rd summary judgment

hearing.

At 11:04 p.m. on the evening of April 21st, 2014,

a motion to intervene was filed.

On April 22nd, 2014, the proposed intervenor filed

a motion to delay the April 23rd hearing.  That motion was

denied as untimely, and argument was set for today to take

up the issue of intervention.

The proposed intervenor has provided no credible

reason for failing to notify the court of its intent to

intervene sooner than the 40-hour windrow prior to the

dispositive motion hearing.

The proposed intervenor had a clear understanding

of the attorney general's position two months prior to the

April 23rd hearing.

The proposed intervenor has submitted no credible

reason for failing to determine whether any Oregon member of

its organization had significant and protectable interests

until, as they stated in their brief, only days ago.  By

their own admission, their membership is only around 100

Oregon members.

Proposed intervenor chose not to file an amicus

brief raising the issue of intervention or even a simple

 1   notice to the court as to their intent.

 2          So I am finding the motion to intervene is

 3   untimely.

 4          With regard to intervention of right, the proposed

 5   intervenor has, among its approximately 100 members, an

 6   unidentified worker in the wedding industry, an unidentified

 7   county clerk, and an unidentified voter that the proposed

 8   intervenor submits have significant protectable interests in

 9   this case.

10          The court and the existing parties are unable to

11   determine the degree of the members' protectable interest

12   because the proposed intervenor has chosen not to disclose

13   their identities.  And I understand there are, I think,

14   genuine issues of concern that the proposed intervenor may

15   have.  But rather than hold a dialogue with the court

16   regarding protective orders or requesting to file

17   declarations under seal or in camera discussions, the

18   proposed intervenor has made the members immune from inquiry

19   by the parties and by the court to ascertain standing on

20   anything other than conclusory statements of the proposed

21   intervenor.

22          One of the proposed members is a voter who voted

23   for passage of Measure 36 in 2004.  The voters' interest in

24   the outcome of a case is of a general interest and not a

25   significant protectable interest that would allow for

1    intervention.

2           One of proposed members is an individual who works

3    as a clerk in a county in Oregon.  The clerk is not

4    appearing in an official capacity as a representative of any

5    particular county or local government.

6           The proposed intervenor has provided little

7    information as to what the clerk's protectable interest is

8    in this litigation other than that he or she may be required

9    to perform a job duty that they might have a moral or

10   religious objection to.  Such a generalized hypothetical

11   grievance, no matter how sincere, does not confer standing.

12   It is not at issue in this case.

13          One of the proposed intervenors' members works as

14   a wedding service provider who also has a general moral or

15   religious objection to same-sex marriage.  It is unclear

16   what service the member provides.

17          The case here is about marriage.  I know,

18   Mr. Eastman, you have tried to clarify this in your brief,

19   but this case is not about who gets to eat cake.  I have

20   married many couples over the years in Oregon who fly off to

21   Hawaii; they fly off to their hometown or their parents'

22   town to take their formal vows and vice versa.  I mean,

23   there are, I assume, same-sex couples who go to Washington

24   to get married and yet they come here to take their vows and

25   ceremonies here in Oregon.

1          Nothing about a ruling I make is going to change

2     that.  Nothing about a ruling I make will change the Oregon

3     laws that forbid businesses from discriminating against

4     consumers based on sexual orientation.  The harm, such as it

5     is, already exists.

6          Discretionary intervention.

7          The proposed intervenor seeks discretionary

8     intervention in order to provide the defense to Oregon

9     marriage laws, quote, that the government itself should be

10    raising but is not, closed quote.  The argument, at the end

11    of the day, is that the Executive -- if the Executive Branch

12    of government is not willing to defend the law the Executive

13    Branch believes is unconstitutional, then someone has to do

14    it and it should be us.

15         The National Organization for Marriage is a

16    Washington, D.C. based political lobbying organization, and

17    and I am not -- I mean, I am just stating what I -- I think

18    it's fact.  I mean, obviously the ACLU is a political

19    lobbying organization as well, but in terms of intervention,

20    I want to focus on that because your membership in Oregon is

21    approximately a 100 members.  I am not finding that that is

22    a representative number of Oregonians.

23         More significantly, the Executive Branch is

24    answerable to the electorate of Oregon.  Mr. Eastman and the

25    directors of the National Organization for Marriage are not.

1              It would be remarkable, following the

2    *Hollingsworth* opinion, for a court to substitute the

3    Executive Branch of government with a private interest

4    organization simply because the organization disagrees with

5    the legal interpretation of Oregon's elected official.

6              This is an Oregon case that impacts the lives of

7    Oregon citizens.  Its timeliness and its posture are not

8    going to be held in abeyance by the intervention of a

9    political lobbying group.

10             I know that many Oregonians are probably

11   disappointed by the lack of adversarial debate in this case,

12   but I am not prepared to substitute the Executive Branch

13   with a third party.  And it's, to some degree, phantoms.

14   It's hard for me to really get a clear idea of these harmed

15   members given the posture they have been presented in.

16             So it's an Oregon case.  It will remain an Oregon

17   case.

18             The motion to intervene is denied.

19             Mr. Eastman, I do appreciate your arguments.  I

20   appreciate your briefing.  You are a smart guy, and I -- you

21   know, thank you.

22             All right.

23             MR. EASTMAN:  Your Honor, if I may --

24             THE COURT:  Yes.

25             MR. EASTMAN:  -- because we need to request a

1    stay.  This is an immediately appealable order, as you know,

2    and we'd like a stay pending appeal of your order.

3            THE COURT:  The stay will be denied.

4            Okay.

5            MR. JOHNSON:  Your Honor, may I make one

6    comment --

7            THE COURT:  Yes.

8            MR. JOHNSON:  -- in terms of your factual

9    findings.

10           I believe that the *Geiger* plaintiffs originally

11   brought their motion for summary judgment in January.  They

12   amended their memo on February 18th, and we also filed our

13   motion for summary judgment on February 18th.

14           I think the March 4th date -- March 4th date is

15   the date that the county replied to our summary judgment

16   motion.

17           THE COURT:  You are correct.  Thank you for

18   correcting that.  I was scribbling down a lot of notes

19   quickly.  Okay.

20           MR. PERRIGUEY:  Your Honor, there was one other

21   factual issue.

22           THE COURT:  Yes.

23           MR. PERRIGUEY:  The state actually issued the

24   order from Michael Jordan the day after the *Geiger*

25   plaintiffs.  You mentioned the *Rummell* plaintiffs in your --

54

1              THE COURT:  Aah.  Okay.

2              MR. PERRIGUEY:  So that's just a slight

3    modification.

4              THE COURT:  All right.  Thank you.  I will allow

5    that correction.

6              Anything else that I have mistaken on my dates?

7              All right.  Thank you very much.

8              THE CLERK:  Court is in recess.

9              *(The proceedings were concluded this*

10             *14th day of May, 2014.)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I hereby certify that the foregoing is a true and

2     correct transcript of the oral proceedings had in the

3     above-entitled matter, to the best of my skill and ability,

4     dated this 15th day of May, 2014.

5

6     /s/Kristi L. Anderson
      _____
7     Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25