IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEANNA L. GEIGER and JANINE M.
NELSON; ROBERT DUEHMIG and
WILLIAM GRIESER,

          Plaintiffs,

      v.

JOHN KITZHABER, in his official capacity
as Governor of Oregon; ELLEN
ROSENBLUM, in her official capacity as
Attorney General of Oregon; JENNIFER
WOODWARD, in her official capacity as
State Registrar, Center for Health Statistics,
Oregon Health Authority, and RANDY
WALRUFF, in his official capacity as
Multnomah County Assessor,

          Defendants.

Case No. 6:13-cv-01834-MC
(lead case)

OPINION

1 – OPINION

PAUL RUMMELL and BENJAMIN WEST;
LISA CHICKADONZ and CHRISTINE
TANNER; BASIC RIGHTS EDUCATION
FUND,

        Plaintiffs,

JOHN KITZHABER, in his official capacity
as Governor of Oregon; ELLEN
ROSENBLUM, in her official capacity as
Attorney General of Oregon; JENNIFER
WOODWARD, in her official capacity as
State Registrar, Center for Health Statistics,
Oregon Health Authority, and RANDY
WALRUFF, in his official capacity as
Multnomah County Assessor,

        Defendants.

Case No. 6:13-cv-02256-MC
(trailing case)

MCSHANE, Judge:

The plaintiffs include four Oregon couples seeking marriage in Multnomah County. Although they meet the legal requirements of civil marriage in all other respects, their requests for marriage licenses have been or would be denied because each couple is of the same gender. I am asked to consider whether the state's constitutional and statutory provisions ("marriage laws") that limit civil marriage to "one man and one woman" violate the United States Constitution.[1] Because Oregon's marriage laws discriminate on the basis of sexual orientation

---

[1] In 1972, the Supreme Court found a lack of "substantial federal question" in the appeal of two men seeking to marry one another after the Minnesota Supreme Court rejected their equal protection and due process claims. *Baker v. Nelson*, 409 U.S. 810, *dismissing appeal from* 191 N.W.2d 185 (1971). Considering 40 years of Supreme Court decisions, the Court's summary order in *Baker* yields no lasting precedential effect in 2014. *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1194-95 (D. Utah 2013) ("[D]octrinal developments in the Court's analysis of both the Equal Protection Clause and the Due Process Clause as they apply to gay men and lesbians demonstrate that the Court's summary dismissal in *Baker* has little if any precedential effect today."); *accord DeBoer v. Snyder*, No. 12–CV–10285, 2014 WL 1100794, at *15 n.6 (E.D. Mich. Mar. 21, 2014); *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1277 (N.D. Okla. 2013); *De Leon v. Perry*, No. SA–13–CA–00982–OLG, 2014 WL 715741, at *10 (W.D. Tex. Feb. 26, 2014); *Bostic v. Rainey*, No. 2:13cv395, 2014 WL 561978, at *10 (E.D. Va. Feb. 13, 2014); *but see*

without a rational relationship to any legitimate government interest, the laws violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## THE PARTIES

All of the plaintiffs[2] share in the characteristics that we would normally look to when we describe the ideals of marriage and family. They present in the record as loving and committed couples who have established long-term relationships. Each has solemnized that relationship in the presence of their families and friends. One couple legally married in Canada, and others temporarily obtained marriage licenses in Multnomah County in 2004. Three of the four couples are parents, and are involved in their children's schools and activities. They support each other financially and emotionally and, by all accounts, their lives have become more meaningful in the single life that they share together.

All of the plaintiffs have worked in Oregon to support each other and their children. They are a highly educated and productive group of individuals. Many of the plaintiffs work in the field of medicine and the health sciences. Mr. Griesar is a teacher. Mr. Rummell is a veteran of the United States Air Force. They pay taxes. They volunteer. They foster and adopt children who have been neglected and abused. They are a source of stability to their extended family, relatives, and friends.

Despite the fact that these couples present so vividly the characteristics of a loving and supportive relationship, none of these ideals we attribute to marriage are spousal prerequisites under Oregon law. In fact, Oregon recognizes a marriage of love with the same equal eye that it recognizes a marriage of convenience. It affords the same set of rights and privileges to Tristan

---

*Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1003 (D. Nev. 2012) ("[T]he present challenge is in the main a garden-variety equal protection challenge precluded by *Baker*.").

[2] Plaintiff Basic Rights Education Fund is a "civil rights organization dedicated to education about and advocacy for equal rights for lesbian, gay, bisexual, and transgender Oregonians[.]" Rummell Mem. Supp. Mot. Summ. J., 5, ECF No. 33.

3 – OPINION

and Isolde that it affords to a Hollywood celebrity waking up in Las Vegas with a blurry memory and a ringed finger. It does not, however, afford these very same rights to gay and lesbian couples who wish to marry within the confines of our geographic borders.

The defendants include the State Registrar, the Governor, and the Attorney General of Oregon, as well as the Assessor for Multnomah County. The defendants concede that Oregon's marriage laws banning same-gender marriage are unconstitutional and legally indefensible, but state they are legally obligated to enforce the laws until this court declares the laws unconstitutional.[3] The case, in this respect, presents itself to this court as something akin to a friendly tennis match rather than a contested and robust proceeding between adversaries.

## BACKGROUND

### I. Same-Gender Marriage in Oregon and Measure 36

Article I, § 20 of the Oregon Constitution prohibits granting privileges or immunities to any citizen or class of citizens that are not equally available on the same terms to all citizens. In 1998, recognizing that same-gender couples were not permitted to marry, the Oregon Court of Appeals concluded Article I, § 20 of the Oregon Constitution prohibited the state from denying insurance benefits to unmarried domestic partners of homosexual employees. *Tanner v. Oregon Health Sci. Univ.*, 157 Or. App. 502, 525. The state responded by providing benefits to same-gender couples who are able to demonstrate they share a committed relationship similar to a marital relationship.

During this same period, challenges regarding the rights available to same-gender couples began to appear in the national spotlight. In 2003, the Supreme Judicial Court of Massachusetts

---

[3] The record must reflect that Multnomah County concluded 10 years ago that denying marriage licenses to same-gender couples violated the Oregon Constitution. Waldruff's Resp. Mot. Summ. J. 1, ECF No. 59. ("The County is proud to have stood firm on this core civil rights issue a decade ago when backing marriage rights for all was neither easy nor politically safe."). Still, due to the State's marriage laws, Multnomah County requires a court order to resume issuing marriage licenses to same-gender couples.

4 – OPINION

concluded that Massachusetts's same-gender marriage ban violated their state constitution. *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 969. With that ruling, Massachusetts became the first state to legalize same-gender marriage.

On March 3, 2004, Multnomah County determined that its failure to issue marriage licenses to same-gender couples violated Article I, § 20 of the Oregon Constitution. *Li v. State*, 338 Or. 376, 383-84 (2005). In the following weeks, approximately 3000 gay and lesbian couples received marriage licenses in Multnomah County. *Id.* at 384. At the Governor's direction, the State Registrar refused to register the same-sex marriages and several same-gender couples brought a legal challenge to decide the inclusivity of Oregon's marriage laws. *Id.*

Before the Supreme Court of Oregon weighed in on the issue, Oregon voters provided their independent judgment on the question by approving a 2004 ballot initiative known as Measure 36. That measure amended the state constitution to define marriage as a union composed of "one man and one woman." Or. Const. art. 15, § 5A. Measure 36 embedded constitutionally what the Oregon Supreme Court would later conclude the state's statutes had already required. *Li*, 338 Or. at 386 ("[A]lthough nothing . . . expressly states that marriage is limited to opposite-sex couples, the context . . . leaves no doubt that, as a statutory matter, marriage in Oregon is so limited."). Nearly a year after Multnomah County began issuing marriage licenses to same-gender couples, those licenses were deemed invalid. *Id.* at 398.

In 2007, the Oregon State Legislature passed the Oregon Family Farness Act, allowing same-gender couples to register their domestic partnerships to receive certain state benefits. Oregon Family Fairness Act, 2007 Or. Laws, ch. 99, § 2 (codified at Or. Rev. Stat. § 106.305). Domestic partnerships provided "more equal treatment of gays and lesbians and their families," § 106.305(6), by granting domestic partners similar rights and privileges to those enjoyed by

5 – OPINION

married spouses, § 106.305(5). The Legislature acknowledged, however, that domestic

partnerships did not include the magnitude of rights inherent in the definition of marriage. §

106.305(7) (noting "that numerous distinctions will exist between these two legally recognized

relationships"). In the declarations submitted to this court, the plaintiffs maintain domestic

partnerships have contributed greater confusion and expense to the lives of gay and lesbian

couples and their families.

Last summer, the United States Supreme Court declared § 3 of the Defense Against

Marriage Act (DOMA) unconstitutional. *United States v. Windsor*, 133 S. Ct. 2675, 2695-96

(2013). As discussed below, DOMA defined marriage as a "union between one man and one

woman," 1 U.S.C. § 7 (2012), thereby prohibiting the federal government from extending

marriage benefits to legally wed, same-gender spouses, *Windsor*, 133 S. Ct. at 2683. The Court

noted marriage regulations were traditionally a matter of state concern and that New York sought

to protect same-gender couples by granting them the right to marry. DOMA violated due process

and equal protection principles because it impermissibly sought to injure a class of persons New

York specifically sought to protect. *Windsor*, 133 S. Ct. at 2693. The Court concluded "[t]he

Act's demonstrated purpose is to ensure that if any State decides to recognize same-sex

marriages, those unions will be treated as second-class marriages for purposes of federal law."

*Id.* at 2693-94.

Following the landmark decision in *Windsor*, Oregon concluded its own agencies must

recognize same-gender marriages lawfully entered into in other jurisdictions. State Defs.'

Answer & Affirmative Defenses to Pls.' Am. Compl. Ex. A, ECF No. 58-1.[4] The state also

joined an *amicus curiae* brief to the Ninth Circuit Court of Appeals, which has been asked to

---

[4] The State's recognition of out-of-state same-gender marriages is limited to administrative agencies, and does not apply to the court system, local governments, or the private sector. Or. Admin. R. 105-010-0018 (2013).

invalidate a same-gender marriage ban in Nevada. Brief of Massachusetts, et al., as *Amici Curiae* in Supp. Mot. App. 2, *Sevcik v. Sandoval* (No. 12-17668). In lending its support, the state endorsed the contention that "same-sex couples form families, raise children, and avail themselves of the benefits and abide by the obligations of marriage in the same manner as different-sex couples." *Id.* In so doing, the state effectively acknowledged that its legitimate interest in sustaining both families and communities would be furthered if gay and lesbian couples were able to marry. *Id.*

**II. The Harm Caused to Plaintiffs by the State's Marriage Laws**

The state's marriage laws impact the plaintiffs in a myriad of ways. The laws frustrate the plaintiffs' freedom to structure a family life and plan for the future. Mr. Rummell did not receive a low-interest veteran loan to aid in purchasing a home because his income was not considered together with Mr. West's income. Ms. Geiger had to ask her employer to extend spousal relocation benefits to Ms. Nelson; a benefit that automatically vests with married couples. When Ms. Chickadonz gave birth to her and Ms. Tanner's children, they encumbered adoption expenses in order for Ms. Tanner to be the legal parent of her own children.

Domestic partnerships pledged to gay and lesbian couples rights and responsibilities approximating those afforded to married couples. Or. Rev. Stat. §§ 106.340(1)-(4). The plaintiffs submit that time has tarnished the promise of domestic partnerships. The plaintiffs explain that a general confusion persists regarding domestic partnerships. They encounter institutional obstacles when lawyers, courts, and health care and funerary service providers are unfamiliar with the rights that domestic partners are entitled to under the law. Domestic partners must draft advance medical directives to ensure they will be able to make important medical decisions on their partner's behalf should the necessity arise. *See* § 127.635(2). Such rights and protections

pass automatically to married couples. § 127.635(2)(b). Likewise, domestic partners must draw up legal devices to imitate marriage's estate-planning benefits. See §§ 112.025, .035. Domestic partners are not guaranteed the same treatment at retirement as married couples. §§ 106.340(6)-(8).

Oregon's marriage laws foreclose its same-gender couples (even those registered as domestic partners) from enjoying newly available federal recognition and benefits. They cannot file joint federal income tax returns. Rev. Rul. 13-17, 2013-38 I.R.B. 204. Instead, unmarried gay and lesbian couples pay for costly measures that account for their mutual incomes, expenses, and assets. Decl. Clift 4, ECF No. 56. Oregon's marriage laws also foreclose the pathway to citizenship that a non-national can access by import of their marriage to a United States citizen. Employer-provided health insurance benefits covering unwed partners is federally taxable income. See 26 U.S.C. §§ 105(b), 106(b). Establishing joint ownership over an unwed couple's assets may trigger federal gift taxation. See Rev. Rul. 13-17 at 203; § 2503(b). Domestic partnership dissolution is taxable, unlike in marriage, see § 1041, as are the spousal-support payments arising from such dissolutions, see § 71. As compared to divorce, federally qualified retirement plans are indivisible among separating domestic partners. See I.R.S. Notice 2008-30, 2008-12 I.R.B. 638. Gay and lesbian couples waiting for the right to marry in Oregon risk a surviving partner being found ineligible for a deceased partner's Social Security benefits. See Soc. Sec. Admin., SSA Pub. No. 05-10084, Social Security: Survivors Benefits 5 (2013). Financial aid packages for the children of gay and lesbian families are calculated only on the basis of one parent's income. See § 1087nn(b).

Oregon's marriage laws weigh on the plaintiffs in ways less tangible, yet no less painful. The laws leave the plaintiffs and their families feeling degraded, humiliated, and stigmatized.

8 – OPINION

Plaintiffs consider the time, energy, and sacrifice they devote to building a meaningful life with

their loved ones, but find their efforts less worthy in the eyes of the law. They face a tiered

system of recognition that grants greater legal status to married felons, deadbeat parents, and

mail-order brides. They see no rationale for such treatment, and are angered by what they

perceive as state-sanctioned discrimination against them. Accordingly, the plaintiffs request that

the state's laws withholding civil marriage from same-gender couples be found unconstitutional.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).

## DISCUSSION

### I. A State's Right to Define Marriage within Constitutional Bounds

[M]arriage is often termed . . . a civil contract . . . [but] it is something more
than a mere contract. . . . It is an institution, in the maintenance of which in its
purity the public is deeply interested, for it is the foundation of the family and
of society, without which there would be neither civilization nor progress.

*Maynard v. Hill*, 125 U.S. 190, 210-11 (1888).[5] Society's significant interest in marriage is

manifest by a state's "rightful and legitimate concern" for its citizens' marital statuses. *Williams*

*v. North Carolina*, 317 U.S. 287, 298 (1942); *see also Li*, 338 Or. at 391-92 (quoting *Dakin v.*

*Dakin*, 197 Or. 69, 72 (1952) ("The marital relationship [is] 'one in which the state is deeply

concerned and over which it exercises a jealous dominion.'"). As the state eloquently notes:

---

[5]     It might be more helpful to think of marriage as just marriage – a relationship out of which spring
duties to both spouse and society and from which are derived rights, [] such as the right to
society and services and to conjugal love and affection – rights which generally prove to be either
priceless or worthless, but which none the less the law sometimes attempts to evaluate in terms
of money.

Williams v. North Carolina, 317 U.S. 287, 317 (1942) (Jackson, J., dissenting).

9 – OPINION

> Simply put, marriage matters. It matters not only for the individuals who decide to
> enter into the civil union, but also for the state. This is why the state links so many
> rights and protections to the decision to marry. Strong, stable marriages create
> unions in which children may be raised to become healthy and productive
> citizens, in which family members care for those who are sick or in need and
> would otherwise have to rely on government assistance, and through which
> community is built and strengthened.

State Defs.' Resp. Mot. Summ. J. 1, ECF No. 64.

A state's concern in regulating marriage includes the power to decide what marriage is

and who may enter into it. *Windsor*, 133 S. Ct. at 2691. This principal role reflects the state

governments' longstanding monopoly over marital relations, an arrangement prevailing even at

the time of the Federal Constitution's adoption. *Id.*

The federal government defers to state marriage authority, accepting that marital policies

may vary from state to state. *Id.* Those variations reflect the dynamics of our federal system,

which empowers citizens to "seek a voice in shaping the destiny of their own times," *Bond v.*

*United States*, 131 S. Ct. 2355, 2364 (2011), and to "form[] a consensus respecting the way

[they] treat each other in their daily contact and constant interaction with each other," *Windsor*,

133 S. Ct. at 2692. Although states have wide latitude in regulating marriage, any such laws must

abide by the Constitution. *Loving v. Virginia*, 388 U.S. 1, 11-12 (1967).

The Constitution commands that no state may "deny to any person . . . the equal

protection of the laws." U.S. Const. amend. XIV, § 1. This pledge of equal protection ensures

"that all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v.*

*Virginia*, 253 U.S. 412, 415 (1920). The clause presumes that one class of citizens will remain

entitled to the same benefits and burdens as the law affords to other classes. Yet, this

presumption is tempered by "the practical necessity that most legislation classifies for one

purpose or another," granting a degree of favor to some and disadvantage to others. *Romer v.*

*Evans*, 517 U.S. 620, 631 (1996). The courts balance the constitutional principle with practical

reality by tolerating laws that classify groups and individuals only if such laws are rationally

related to a legitimate state purpose. *Id.*

States can and do rationally regulate marriage. A state may, for example, permit eighteen

year olds to marry, but not twelve year olds. *See* Jonathan Todres, *Maturity*, 48 Hous. L. Rev.

1107, 1143 (2012). A state may not, however, prevent a "white" adult from marrying a "non-

white" adult, *Loving*, 388 U.S. at 11 (overturning one such anti-miscegenation law in Virginia),

nor may it withhold marriage from either the destitute, *Zablocki v. Redhail*, 434 U.S. 374, 387-88

(1978) (overturning a Wisconsin law conditioning marriage on a non-custodial parent's ability to

satisfy existing child-support obligations), or the incarcerated, *Turner v. Safley*, 482 U.S. 78, 96-

99 (1987) (overturning Missouri's requirement that inmates receive a warden's permission to

wed), *superseded by statute*, Religious Land Use and Institutionalized Persons Act of 2000, Pub.

L. No. 106-274, § 3, 114 Stat. 804. One lesson to borrow from these and similar precedents is

that laws regulating marriage must advance legitimate state interests, and not a mere desire to

harm a particular class of its citizens.

## II. The *Windsor* Decision and its Applicability to the Plaintiffs' Claims

As noted, DOMA was a federal attempt to regulate marriage. That law defined

"marriage" and "spouse" to encompass opposite-gender couples only. *See* 1 U.S.C. § 7. The

definition's effect was to make legally married same-gender couples less equal than married

opposite-gender couples by depriving the former of numerous federal marital benefits. *Windsor*,

133 S. Ct. at 2694. That result frustrated New York's rightful decision to confer the dignity and

privilege of marriage upon gay and lesbian couples. *Id.* at 2695-96. In striking down the federal

definition, the Supreme Court explained that the law's "principal purpose and . . . necessary

11 – OPINION

effect" was "to demean" legally married gay and lesbian couples. *Id.* at 2695. "[N]o legitimate

purpose" behind DOMA could overcome such injury. *Id.* at 2696.

The case before me is not a reproduction of *Windsor*. There, the Supreme Court

invalidated a federal act that impinged New York's ability to afford gay and lesbian couples the

full entitlements of marriage. *Id.* at 2693 ("[DOMA] . . . impose[s] a disadvantage, a separate

status  . . . upon all who enter into same-sex marriages made lawful by the unquestioned

authority of the States."). Here, the plaintiffs challenge not federal but state law, one which

reserves civil marriage to the exclusive enjoyment of opposite-gender couples. This and similar

state marriage laws elsewhere are simply beyond the ambit of the *Windsor* ruling. *See Bishop v.*

*United States ex rel. Holder*, 962 F. Supp. 2d. 1252, 1278 (N.D. Okla. 2013) ("*Windsor* does not

answer whether a state may prohibit same-sex marriage in the first instance.").

*Windsor* may be distinguished from the present case in several respects. Yet, recounting

such differences will not detract from the underlying principle shared in common by that case

and the one now before me. The principle is one inscribed in the Constitution, and it requires that

the state's marriage laws not "degrade or demean" the plaintiffs in violation of their rights to

equal protection. *See Windsor*, 133 S. Ct. at 2695.

**III. The State's Marriage Laws Violate the Plaintiffs' Rights to Equal Protection**

As discussed above, although states may regulate marriage, such laws must pass

constitutional muster. Plaintiffs argue the state's marriage laws violate their rights to equal

protection. When analyzing a law under the Equal Protection Clause of the Fourteenth

Amendment, the court first determines the appropriate level of scrutiny to apply.

Strict scrutiny, the most exacting level of scrutiny, is reserved for "suspect"

classifications such as race or national origin. *Johnson v. California*, 543 U.S. 499, 505-06

(2005). Because suspect classifications "raise special fears that they are motivated by an invidious purpose," courts must engage in a "searching judicial inquiry" to ferret out any illegitimate uses of such classifications. *Id.* Under this level of review, the government has the burden of demonstrating the classifications are narrowly tailored to further a compelling government interest. *Id.* at 505.

Other classifications, such as those based on gender or illegitimacy, are subject to heightened scrutiny. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985). Under this level of review, the classification must be "substantially related to a sufficiently important government interest." *Id.* at 441.

Most classifications are presumed to be valid and receive less-exacting judicial scrutiny, known as rational basis review.

> Under rational basis review, the Equal Protection Claus is satisfied if: (1) there is a plausible policy reason for the classification, (2) the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and (3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Bowers v. Whitman*, 671 F.3d 905, 917 (9th Cir. 2012) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)) (internal quotations omitted).

## A. Discriminatory Classification

Plaintiffs argue the state's marriage laws discriminate based on gender, and therefore must receive heightened scrutiny. This argument reasons that because men may not marry other men, and women may not marry other women, the classification is necessarily one based on gender. Stated another way, if either person in a specific couple happened to be of the other gender, the couple could in fact marry. Because the classification impacts each couple based

solely on the gender of each person, plaintiffs argue the classification must be categorized as one based on gender. I disagree.

The state's marriage laws discriminate based on sexual orientation, not gender. In fact, the ban does not treat genders differently at all. Men and women are prohibited from doing the exact same thing: marrying an individual of the same gender. The ban does not impact males and females differently. Instead, the state's marriage laws classify same-gender couples differently than opposite-gender couples. While opposite-gender couples may marry a partner of their choice, same-gender couples may not.

Plaintiffs argue the Supreme Court has rejected government arguments based on "equal application" of laws that discriminate based on suspect classes. *See Loving*, 388 U.S. at 8-9. The discriminatory laws in *Loving*, however, are not applicable to Oregon's marriage laws. First, the Court specifically noted the anti-miscegenation laws at issue there—because they involved racial classifications—could not survive an "equal application" explanation. *Id*. Second, the anti-miscegenation laws there were "invidious racial discriminations," with proffered purposes of "preserv[ing] the racial integrity of its citizens" and preventing "the corruption of blood[.]" *Id*. at 7 (quoting *Naim v. Naim*, 87 S.E. 2d 749, 756 (Va. 1955)).

There is no such invidious gender-based discrimination here. The state's marriage laws clearly were meant to, and indeed accomplished the goal of, preventing same-gender couples from marrying. The targeted group here is neither males nor females, but homosexual males and homosexual females. Therefore, I conclude the state's marriage laws discriminate on the basis of sexual orientation, not gender. *See Sevcik*, 911 F. Supp. 2d at 1005 (analyzing a similar Nevada law, the court concluded the law was not directed toward any one gender and did not affect one

gender in a way demonstrating any gender-based animus, but was intended to prevent

homosexuals from marrying).

**B. Applicable Level of Scrutiny**

That the state's marriage laws discriminate based on sexual orientation does not answer

the question of what level of scrutiny applies. For the past quarter century, laws discriminating

on the basis of sexual orientation received rational basis review in the Ninth Circuit. *High Tech*

*Gays v. Def. Indus. Sec. Clearance Off.*, 895 F.2d 563, 574 (9th Cir. 1990). In *High Tech Gays*, a

class of plaintiffs challenged the Department of Defense's policy of "refusing to grant security

clearances to known or suspected gay applicants" on equal protection grounds. *Id.* at 565. The

court had to determine whether homosexuals were a "suspect" or "quasi-suspect" class justifying

the classifications to heightened review. The court inquired whether homosexuals:

> 1) Have suffered a history of discrimination; 2) exhibit obvious immutable, or
> distinguishing characteristics that define them as a discrete group; and 3) show
> that they are a minority or politically powerless, or alternatively show that the
> statutory classification at issue burdens a fundamental right.

*Id.* at 573. The court concluded that although homosexuals suffered a history of discrimination,

they did not meet the other criteria required of suspect classes. Therefore, classifications based

on sexual orientation received rational basis review. *Id.* at 574.

A Ninth Circuit panel recently considered whether *High Tech* Gays remains good law in

light of *Windsor. SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 480-84 (9th Cir.

2014). After noting that *Windsor* was silent as to the precise level of scrutiny applied to the

sexual orientation discrimination at issue there, the *SmithKline* court looked at what *Windsor*

"actually did" in analyzing that equal protection claim. *Id.* at 480. After a thorough and

persuasive analysis, the court concluded:

> In its words and its deed, *Windsor* established a level of scrutiny for
> classifications based on sexual orientation that is unquestionably higher than

15 – OPINION

rational basis review. In other words, *Windsor* requires that heightened scrutiny
be applied to equal protection claims involving sexual orientation.

*Id.* at 481.

No mandate issued from *SmithKline* and, although neither party requested a rehearing en

banc, at least one active judge of the Ninth Circuit made a *sua sponte* call for a rehearing en

banc. March 27, 2014 Order (No. 11-17357, ECF No. 88). "An appellate court's decision is not

final until its mandate issues." *Beardslee v. Brown*, 393 F.3d 899, 901 (9th Cir. 2004); *accord*

*United States v. Ruiz*, 935 F.2d 1033, 1037 (9th Cir. 1991) (citation and internal quotations

omitted) ("[T]he legitimacy of an expectation of finality of an appellate order depends on the

issuance or not of the mandate required to enforce the order."). Absent a mandate's issuance, the

circuit "retains jurisdiction of the case and may modify or rescind its opinion." *Ruiz*, 935 F.2d at

1037; *accord Carver v. Lehman*, 558 F.3d 869, 878 (9th Cir. 2009).

In other words, the panel's decision in *SmithKline* is not yet a truly final and binding

decision. The opinion may be modified, rescinded, or receive a majority vote for en banc review.

I could independently conclude the Supreme Court did what *SmithKline* persuasively concluded

it did. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (circuit panels and district courts

may reject a prior panel's opinion when that opinion is "effectively overruled" by higher court).

That is unnecessary here, as the state's marriage laws cannot withstand even the most relaxed

level of scrutiny.

## C. Rational Basis Review

As described above, it is beyond question that Oregon's marriage laws place burdens

upon same-gender couples that are not placed upon opposite-gender couples. This classification

implicates the Equal Protection Clause. *Romer v. Evans*, 517 U.S. 620, 633 (1996) ("A law

declaring that in general it shall be more difficult for one group of citizens than for all others to

16 – OPINION

seek aid from the government is itself a denial of equal protection of the laws in the most literal sense."). The Equal Protection Clause does not allow classifications drawn solely for the purpose of disadvantaging a particular group intentionally singled out for unequal treatment. *Id*. For this reason, courts inquire whether the classification is rationally related to a legitimate government interest. *Id*. at 632-33. Courts presume the classification is valid, declaring it unconstitutional only when "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979). That a majority of Oregon voters enacted Measure 36 in order to constitutionally embed such classifications makes no difference to this analysis. *Romer*, 517 U.S. at 635.

As noted by the state, justifications offered in enacting Measure 36 are similar to those offered by other states in defending other bans on same-gender marriage. One such justification is protecting traditional definitions of marriage. Another is protecting children and encouraging stable families. As discussed below, only the latter justification is a legitimate state interest. Especially when viewed in light of the state's other official policies, many of which are unique to Oregon, the state's ban on same-gender marriage is clearly unrelated to protecting children and encouraging stable families. The marriage laws place the plaintiffs and other gay and lesbian couples seeking to marry in Oregon at a disadvantage, and the laws do so without any rationally related government purpose.

**i. Tradition**

Marriage has traditionally been limited to opposite-gender couples. That the traditional definition of marriage excluded same-gender couples, however, does not end the inquiry. *See Heller v. Doe*, 509 U.S. 312, 326 (1993) ("Ancient lineage of a legal concept does not give it

17 – OPINION

immunity from attack for lacking a rational basis."). If tradition alone was sufficient to withstand rational basis review, the right to equal protection would be quite hollow. "Tradition" would simply turn rational basis review into a rubber stamp condoning discrimination against longstanding, traditionally oppressed minority classes everywhere. Limiting civil marriage to opposite-gender couples based only on a traditional definition of marriage is simply not a legitimate purpose. *Golinski v. Off. of Pers. Mgmt.*, 824 F. Supp. 2d 968, 998 (N.D. Cal. 2012) ("[T]he argument that the definition of marriage should remain the same for the definition's sake is a circular argument, not a rational justification. Simply stating what has always been does not address the reasons for it. The mere fact that prior law, history, tradition, the dictionary and the Bible have defined a term does not give that definition a rational basis, it merely states what has been.").

Certain traditions may reflect personal religious and moral beliefs. Such beliefs likely informed the votes of many who favored Measure 36. However, as expressed merely a year before Measure 36's passage, "[m]oral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be 'drawn for the purpose of disadvantaging the group burdened by the law.'" *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring in the judgment) (quoting *Romer*, 517 U.S. at 633). That year, the Supreme Court concluded a Texas law criminalizing private, consensual, sexual acts between two adults was unconstitutional. The Court explicitly adopted Justice Stevens' dissent in *Bowers v. Hardwick*, 478 U.S. 186, 216 (1986), another case involving laws criminalizing homosexual conduct. *Lawrence*, 539 U.W. 577-78. Over a vigorous dissent from Justice Scalia, the Court adopted Justice Stevens' earlier conclusion that "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is

18'– OPINION

not a sufficient reason for upholding a law prohibiting the practice[.]" *Id.* at 577. This remains

the law of the land, that mere moral disapproval of a particular group of citizens is not a

legitimate reason for intentionally withholding rights and benefits from that group.

To be clear, this case deals with civil marriage. The state recognizes that marriage is a

civil contract. Or. Rev. Stat. § 106.010. It is that right, to enter into a civil contract of marriage,

and the right to share in the benefits and obligations flowing from that civil contract, that are at

issue here. Judge John G. Heyburn II of the Western District of Kentucky, one of an ever-

increasing—and so far unanimous—number of state and federal judges to strike down similar

state bans following *Windsor,* put it very well:

> Our religious and social traditions are vital to the fabric of society. Though each
> faith, minister, and individual can define marriage for themselves, at issue here
> are laws that act outside that protected sphere. Once the government defines
> marriage and attaches benefits to that definition, it must do so constitutionally. It
> cannot impose a traditional or faith-based limitation upon a public right without a
> sufficient justification for it. Assigning a religious or traditional rationale for a
> law, does not make it constitutional when that law discriminates against a class of
> people without other reasons.
>
> The beauty of our Constitution is that it accommodates our individual faith's
> definition of marriage while preventing the government from unlawfully treating
> us differently. This is hardly surprising since it was written by people who came
> to America to find both freedom of religion and freedom from it.

*Bourke v. Beshear,* 3:13-750, 2014 WL 556729, at *10 (Feb. 12, 2014).

Overturning the discriminatory marriage laws will not upset Oregonians' religious beliefs

and freedoms.[6] As tradition alone does not provide a legitimate state interest supporting

---

[6] The New Mexico Supreme Court succinctly noted what religious impact allowing same-gender marriage would
have: "Our holding will not interfere with the religious freedom of religious organizations or clergy because (1) no
religious organization will have to change its policies to accommodate same-gender couples, and (2) no
religious clergy will be required to solemnize a marriage in contravention of his or her religious beliefs." *Griego v. Oliver,* 316
P.3d 865, 871 (2013); *see also Kitchen,* 961 F. Supp. 2d at 1214 ("[T]he court notes that its decision does not
mandate any change for religious institutions, which may continue to express their own moral viewpoints and
define their own traditions about marriage.").

19 -- OPINION

classifications based on sexual orientation, I turn to other possible justifications for the state's marriage laws.

### ii. Protecting Children and Encouraging Stable Families

Supporters of Measure 36, and defenders of similar marriage laws throughout the country, often turn to variations of the state's interest in protecting children and families in supporting such laws. These arguments range from state interests in encouraging responsible and "natural" procreation to arguments that children fare better in opposite-gender families. Although protecting children and promoting stable families is certainly a legitimate governmental interest, the state's marriage laws do not advance this interest—they harm it.

Although the state has a legitimate interest in promoting stable families, its interest does not stop with families of opposite-gender couples. By enabling gay and lesbian couples to enter domestic partnerships, the state acknowledged the value and importance such families can provide. Specifically, the Oregon Legislature, in enacting the Oregon Family Fairness Act, found that "[t]his state has a strong interest in promoting stable and lasting families, including the families of same-sex couples and their children. All Oregon families should be provided with the opportunity to obtain necessary legal protections and status and the ability to achieve their fullest potential." § 106.305(4). The legislature also found that "[m]any gay and lesbian Oregonians have formed lasting, committed, caring and faithful relationships with individuals of the same sex, despite long-standing social and economic discrimination. These couples live together, participate in their communities together and often raise children and care for family members together, just as do couples who are married under Oregon law." § 106.305(3). With this finding, the legislature acknowledged that our communities depend on, and are strengthened by, strong, stable families of all types whether headed by gay, lesbian, or straight couples.

20 – OPINION

Yet, because the state is unable to extend to opposite-gender relationships the full rights, benefits, and responsibilities of marriage, it is forced to burden, demean, and harm gay and lesbian couples and their families so long as its current marriage laws stand. Although the state created domestic partnerships to "ensure[e] more equal treatment of gays and lesbians and their families," § 106.305(6), it also recognized domestic partnerships are not equal to civil marriage, § 106.305(7). Recognizing domestic partnerships are not equal to marriage simply states the obvious. In *Windsor*, Justice Kennedy recently pointed out rather dramatically these inequalities. Justice Kennedy recognized that prohibiting same-gender couples from joining in marriage "humiliates" children being raised by same-gender couples and "makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and their daily lives." 133 S. Ct. at 2694. Creating second-tier families does not advance the state's strong interest in promoting and protecting all families.

Nor does prohibiting same-gender marriage further Oregon's interest in protecting all children. For example, the state's interest in protecting children concerns more than just those children created in wedlock. § 109.060 (relationship between child and parents is the same regardless of parents' marital status). The state has an interest in protecting all children, including adopted children. § 109.050 (relationship of adoptive child and adoptive parents is the same as would exist if the child had been the adoptive parents' biological child). And the state does not treat "naturally and legitimately conceived" children any different than children conceived in other ways. § 109.243 (rights between a child produced by artificial insemination and a mother's husband are the same as those that exist in a naturally conceived birth). When the state seeks homes to provide security and support for vulnerable children, it does so without asking if the adults in such households are married, same-gender partnered, or single. St. Defs.'

21 – OPINION

Resp. Mot. Summ. J. 22, ECF No. 64. The state's policies clearly demonstrate its interest in supporting all children, including children raised by same-gender couples.

The above policies make perfect sense. Oregon's policies accept that children fare the same whether raised by opposite-gender or same-gender couples. *See DeBoer v. Snyder*, No. 12-10285, 2014 WL 1100794, at *12 (E.D. Mich. March 21, 2014) (noting approximately 150 sociological and psychological studies confirm "there is simply no scientific basis to conclude that children raised in same-sex households fare worse than those raised in heterosexual households."); *De Leon v. Perry*, No. SA-13-CA-00982-OLG, 2014 WL 715741, at *15 (W.D. Tex. Feb. 26, 2014) ("[S]ame-sex couples can be just as responsible for a child's welfare as the countless heterosexual couples across the nation."); *Bostic v. Rainey*, 970 F. Supp. 2d 456, 479 (E.D. Va. 2014) ("Same-sex couples can be just as responsible for a child's existence as the countless couples across the nation who choose, or are compelled to rely upon, enhanced or alternative reproduction methods for procreation."); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 980 (N.D. Cal. 2010) (finding "[t]he gender of a child's parent is not a factor in a child's adjustment. The sexual orientation of an individual does not determine whether that individual can be a good parent. Children raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted. The research supporting this conclusion is accepted beyond serious debate in the field of developmental psychology."). The realization that same-gender couples make just as good parents as opposite-gender couples is supported by more than just common sense; it is also supported by "the vast majority of scientific studies" examining the issue. *See* Brief of the Am. Psychol. Ass'n, et al. as Amici Curia, *United States v. Windsor*, 133 S. Ct. 2675, 2695-96 (2013) (12-307), 2013 WL 871958, at *19 (listing studies).

Some argue the state's interest in responsible procreation supports same-gender marriage bans. Procreation, however, is not vital to the state's interest in marriage. Procreative potential is not a marriage prerequisite. § 106.010 (marriage is a civil contract between males and females at least 17 years of age). There is no prohibition to marriage as to sterile or infertile persons, or upon couples who have no desire to have children. The only prohibited marriages, other than those between same-gender couples, are those involving first cousins or those in which either party is already married. § 106.020.

Additionally, any governmental interest in responsible procreation is not advanced by denying marriage to gay a lesbian couples. There is no logical nexus between the interest and the exclusion. *See Bishop*, 962 F. Supp. 2d. at 1291 ("[T]here is no rational link between excluding same-sex couples from marriage and the goals of encouraging 'responsible procreation' . . . ."). Opposite-gender couples will continue to choose to have children responsibly or not, and those considerations are not impacted in any way by whether same-gender couples are allowed to marry. Nothing in this court's opinion today will effect the miracle of birth, accidental or otherwise. A couple who has had an unplanned child has, by definition, given little thought to the outcome of their actions. The fact that their lesbian neighbors got married in the month prior to conception seems of little import to the stork that is flying their way.

The logical nexus between the state's interest in "natural" procreation and denying marriage to same-gender couples is as unpersuasive as the argument in favor of responsible procreation. Oregon law plays no favorites between "naturally and legitimately conceived" children and those conceived via artificial insemination. § 109.243 (so long as the husband consented to the artificial insemination, the child will have the same rights and relationship as

between naturally conceived children). The state's interest is in a child's well-being regardless of the means of conception. There is simply no rational argument connecting this interest to the prohibition of same-gender marriage.

Although protecting children and promoting stable families is a legitimate governmental purpose, prohibiting same-gender couples from marrying is not rationally related to that interest. To justify classifications singling out a particular class of persons, the law must, at a minimum, contain some "factual context" tying the classification to the purpose sought to be achieved. *Romer*, 517 U.S. at 632-33. There is no such factual context here. In fact, the relationship between prohibiting same-gender couples from marrying and protecting children and promoting stable families is utterly arbitrary and completely irrational. The state's marriage laws fly in the face of the state's "strong interest in promoting stable and lasting families, including the families of same-sex couples and their children." § 106.305(4).

Expanding the embrace of civil marriage to gay and lesbian couples will not burden any legitimate state interest. The attractiveness of marriage to opposite-gender couples is not derived from its inaccessibility to same-gender couples. *See Perry*, 704 F. Supp. 2d at 972 ("Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages."). The well-being of Oregon's children is not enhanced by destabilizing and limiting the rights and resources available to gay and lesbian families. *See Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 994-95 (S.D. Ohio 2013) ("The only effect the bans have on children's well-being is harming the children of same-sex couples who are denied the protection and stability of having parents who are legally married.").

24 – OPINION

The state's marriage laws unjustifiably treat same-gender couples differently than opposite-gender couples. The laws assess a couple's fitness for civil marriage based on their sexual orientation: opposite-gender couples pass; same-gender couples do not. No legitimate state purpose justifies the preclusion of gay and lesbian couples from civil marriage.

## CONCLUSION

I am aware that a large number of Oregonians, perhaps even a majority, have religious or moral objections to expanding the definition of civil marriage (and thereby expanding the benefits and rights that accompany marriage) to gay and lesbian families. It was these same objections that led to the passage of Measure 36 in 2004. Generations of Americans, my own included, were raised in a world in which homosexuality was believed to be a moral perversion, a mental disorder, or a mortal sin.  I remember that one of the more popular playground games of my childhood was called "smear the queer"[7] and it was played with great zeal and without a moment's thought to today's political correctness. On a darker level, that same worldview led to an environment of cruelty, violence, and self-loathing. It was but 1986 when the United States Supreme Court justified, on the basis of a "millennia of moral teaching," the imprisonment of gay men and lesbian women who engaged in consensual sexual acts. *Bowers*, 478 U.S. at 197 (Burger, C.J., concurring), *overruled by Lawrence*, 539 U.S. at 578. Even today I am reminded of the legacy that we have bequeathed today's generation when my son looks dismissively at the sweater I bought him for Christmas and, with a roll of his eyes, says "dad . . . that is so gay."

It is not surprising then that many of us raised with such a world view would wish to protect our beliefs and our families by turning to the ballot box to enshrine in law those traditions

---

[7] The game entailed boys tackling one another "until one survivor remained standing." *Frazier v. Norton*, 334 N.W.2d 865, 866 (S.D. 1983). Children today continue to play the game, now known as "kill the carrier."

25 – OPINION

we have come to value. But just as the Constitution protects the expression of these moral viewpoints, it equally protects the minority from being diminished by them.

It is at times difficult to see past the shrillness of the debate. Accusations of religious bigotry and banners reading "God Hates Fags" make for a messy democracy and, at times, test the First Amendment resolve of both sides. At the core of the Equal Protection Clause, however, there exists a foundational belief that certain rights should be shielded from the barking crowds; that certain rights are subject to ownership by all and not the stake hold of popular trend or shifting majorities.

My decision will not be the final word on this subject, but on this issue of marriage I am struck more by our similarities than our differences. I believe that if we can look for a moment past gender and sexuality, we can see in these plaintiffs nothing more or less than our own families. Families who we would expect our Constitution to protect, if not exalt, in equal measure. With discernment we see not shadows lurking in closets or the stereotypes of what was once believed; rather, we see families committed to the common purpose of love, devotion, and service to the greater community.

Where will this all lead? I know that many suggest we are going down a slippery slope that will have no moral boundaries. To those who truly harbor such fears, I can only say this: Let us look less to the sky to see what might fall; rather, let us look to each other . . . and rise.

ORDER TO FOLLOW.


DATED this __19__ th day of May, 2014.

_____
Michael J. McShane
United States District Judge


26 – OPINION